United States Court of Appeals,

Fifth Circuit.

No. 92-7420.

MISSISSIPPI POULTRY ASSOCIATION, INC., et al., Plaintiffs-Appellees,

v.

Edward R. MADIGAN, Secretary of the United States Department of Agriculture, et al., Defendants-Appellants.

Sept. 9, 1994.

Appeal from the United States District Court for the Southern District of Mississippi.

Before POLITZ, Chief Judge, REAVLEY, KING, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH, DUHÉ, WIENER, BARKSDALE, EMILIO M. GARZA, DeMOSS and STEWART, Circuit Judges.[*]

WIENER, Circuit Judge:

Today we must decide whether a critical inspection standard contained in a regulation promulgated by the Secretary of Agriculture ("Secretary") is contrary to the plain language of § 17(d) of the Poultry Products Inspection Act ("PPIA").[1]

Under the PPIA, Congress devised a two-track system for regulating domestic poultry production: Domestic producers who wish to sell products *inter* state must comply with the *federal* standards embodied in the federal regulatory program;[2] domestic producers who wish to sell products only *intra* state may do so by complying with any *state* regulatory program with standards "at least equal to" the federal program.[3] Reduced to the simplest terms, Congress thus subjected all domestic poultry production sold in *inter* state commerce to a single, federal program with uniform

[*]Judges Benavides and Parker did not participate in the consideration of this case at oral argument en banc and have elected not to take part in subsequent deliberations or in the opinions of the en banc court.

[1]Codified at 21 U.S.C. §§ 451-70.

[2]*See* 21 U.S.C. § 459 (requiring compliance by "all establishments" with the PPIA) & § 463 (authorizing Secretary to promulgate regulations to effectuate the PPIA).

[3]*See* 21 U.S.C. § 454 (creating exception to federal regulatory scheme for poultry products that are inspected under state standards that are "at least equal to" federal standards and that are distributed wholly within the state).

standards.

Congress also addressed the issue of foreign standards. Under § 17(d) of the PPIA, Congress directed the Secretary to require imported poultry products to be "subject to *the same* ... standards applied to products produced in the United States."[4] Were that congressional mandate to be enforced strictly, all poultry sold in *inter* state commerce—whether produced in this country or anywhere else in the world—would be inspected pursuant to the uniform federal standards. Despite this congressional command, however, the Secretary promulgated the challenged regulation allowing foreign—but not domestic—poultry products to be imported and sold in interstate commerce, even though such poultry is inspected under *different* standards, as long as the foreign standards are determined by the Secretary to be "at least equal to" the federal standards.[5] Given the plain language and structure of the PPIA, we conclude that this regulation cannot withstand the instant challenge. Because the phrase "at least equal to," as used in the PPIA, inescapably infers the existence of a *difference*—and the phrase "the same as," as used in the PPIA, eschews any possibility of more than a technical or de minimis difference, neither phrase can ever be synonymous with the other in the PPIA.

I

BACKGROUND

Understanding the historical development of the PPIA is necessary to comprehend fully the significance of § 17(d)'s "the same" requirement as an integral structural element of the PPIA. In 1957 Congress enacted the PPIA,[6] thereby establishing a comprehensive federal program for the regulation of poultry products.[7] The PPIA was enacted to serve a two-fold purpose: To protect

---

[4]Codified at 21 U.S.C. § 466(d) (emphasis added).

[5]9 C.F.R. § 381.196.

[6]Pub.L. No. 85-172, 71 Stat. 441 (1957).

[7]This federal regulatory scheme provides, *inter alia,* general standards regarding inspections and labeling of poultry products, and sanitation at production facilities. *See* 21 U.S.C. § 455 (inspection), § 456 (sanitation), & § 457 (labeling). It also contains a list of definitions and "prohibited acts," along with a detailed scheme for monitoring compliance. *See* 21 U.S.C. § 453 (definitions), § 458 (prohibited acts), and §§ 455-57, 460, 462, 467-70 (containing monitoring

consumers from misbranded, unwholesome, or adulterated products, and to protect the domestic poultry market from unfair competition.[8]

Typically, the safety and unfair competition goals are closely related.  Of significance here, however, was Congress' concern with more than differences in *product* when it addressed unfair competition.  Specifically, Congress also recognized that differences in *regulation* could also cause unfair competition.  Indeed, in its original form, § 2 of the PPIA justified regulation of poultry sold in "large centers of population" on the belief that uninspected poultry products—regardless of whether such products were unsafe—adversely affected the national market for inspected poultry products.[9]

The PPIA created one uniform regulatory scheme for the national market, although, as originally enacted, it did not extend to products sold in *intra* state commerce other than those products sold in "large centers of population."[10]  As for poultry produced in foreign countries, initially § 17 of the PPIA merely proscribed importation of products that were "unhealthful, unwholesome, or adulterated," and authorized the Secretary to promulgate regulations accordingly.

In 1968 Congress amended the PPIA to include within its ambit poultry produced and sold in *intra* state commerce.[11]  Principles of federalism, however, led Congress to choose not to displace state inspection programs.[12]  Instead, Congress in these amendments created a complex "marbled

provisions).  In addition, administration of this scheme is placed under the control of the Secretary, who is also authorized to promulgate regulations to "flesh out" its general standards. *See, e.g.,* 21 U.S.C. § 463.

[8]*See* 21 U.S.C. § 451.

[9]*See* PPIA, Pub.L. No. 85-172, § 2, 71 Stat. 441 (amended 1968).

[10]*See id.*

[11]Congress included all poultry products by finding that the sale of any unwholesome, adulterated, or misbranded poultry "burdens" or "substantially affects" interstate commerce. Wholesome Poultry Products Act, Pub.L. No. 90-492, § 2, 82 Stat. 791 (1968) (codified at 21 U.S.C. § 451).

[12]In the introduction to the 1968 amendments, Congress states *inter alia* that is has passed "[a]n Act to ... to provide for cooperation with appropriate State agencies with respect to State poultry products inspection programs."  Wholesome Poultry Products Act, Pub.L. No. 90-492, 82 Stat. 791 (1968).  Further, the introduction to the operative provision of these amendments

cake" scheme in which the Secretary offers state inspection programs technical and laboratory assistance, training, and partial funding.[13] These amendments to the PPIA also provided for a state-federal advisory board to achieve better coordination and uniformity between the federal and the state programs.[14] Finally, the amended PPIA provided that if a state inspection program is—as determined by the Secretary—"at least equal to" the federal one, then poultry inspected under that program may be offered for sale, but still only *intra* state.[15]

Even after the 1968 amendments, then, the PPIA maintained uniformity regarding the *inter* state sale of domestic poultry products. Such sales still could occur only if the poultry had been inspected under **THE** federal program—not under some state program, whether identical or equivalent—and then only according to **THE** uniform federal standards.[16]

The 1968 amendments did not alter the standards for imported poultry products. The House Report accompanying these amendments candidly states the then-extant trade considerations underlying this omission:

> The committee concluded that more stringent regulation of imports, when not required might result in the enactment of measures abroad which could hamper the exportation of U.S. slaughtered poultry and poultry products, the volume of which far exceeds the imports.[17]

---

provides that: "It is the policy of Congress to protect the consuming public from poultry products that are adulterated or misbranded and to assist in efforts by State and other government agencies to accomplish this objective." 21 U.S.C. § 454(a). The remainder of § 454 goes on to provide the framework for federal-state cooperation in the implementation and oversight of state poultry inspection programs.

[13]*See* 21 U.S.C. § 454(a).

[14]*Id.*

[15]*Id.*

[16]The operative provision provides that state poultry inspection programs only apply to "poultry products for use as human food *solely for distribution within such state.*" 21 U.S.C. § 454(a)(1) (emphasis added).

> In enacting the 1968 amendments, Congress did consider allowing poultry inspected according to state standards to enter interstate commerce. This approach was ultimately rejected, however, because it would have added another layer of complexity to the regulation of food products and may have confused consumers. H.R. No. 1333, 90th Cong., 2d Sess. (1968), *reprinted in* 3 U.S.C.C.A.N. 3426, 3434 (1968).

[17]H.R. No. 1333, 90th Cong., 2d Sess. (1968), *reprinted in* 3 U.S.C.C.A.N. 3428-29 (1968).

In 1972 the Secretary revised the regulations regarding those standards.[18] By this time, the Secretary was overseeing two distinct poultry inspection programs: For intrastate sales, state programs employing standards "at least equal to" the federal program; for all interstate sales, exclusively the federal program. Even though imported poultry was destined to move in interstate commerce, the Secretary chose to regulate such poultry in accordance with the *intra* state "at least equal to" standard, not the "same" standard (i.e. the federal one) applied to *inter* state sales.[19]

As can be imagined, the Secretary's decision had great and immediate significance to domestic poultry producers. In sum, the only way a domestic poultry producer may sell products interstate is if that producer submits to the federal program—the myriad regulations of which are now embodied in a daunting 170 pages of the *Code of Federal Regulations.*[20] In contrast, the Secretary's choice of the "at least equal to" standard allowed foreign poultry producers—but not domestic ones—to sell products in interstate commerce that had been inspected under any different set of standards if, in the Secretary's judgment, the relevant foreign country's poultry inspection program was "at least equal to" the federal one. Given this disparity, domestic poultry producers could have complained that the adoption of the "at least equal to" standard offered foreign poultry producers a potential competitive advantage based on nothing more than the fact that domestic and foreign poultry producers were subject to different regulatory programs.[21]

Next, as part of the Food Security Act of 1985 ("1985 Farm Bill"), Congress amended § 17 of the PPIA to provide that imported poultry:

> shall ... be subject to *the same* inspection, sanitary, quality, species verification, and the

---

[18]Prior to this revision, the Secretary used a "substantial equivalent of" standard. *See* 7 C.F.R. § 81.301 (1972). At the time these standards were adopted, the Secretary was operating under a statute that gave him broad discretion, with the only limitation being that he had to exclude imported poultry that was "unhealthful, unwholesome, or misbranded." *See* PPIA, Pub.L. No. 85-172, § 17, 71 Stat. 448 (1957) (amended 1985).

[19]37 Fed.Reg. 9706 (May 16, 1972).

[20]These regulations are located at 9 C.F.R. § 381.1-.311.

[21]Indeed, once the domestic poultry producers had a textual basis on which to challenge the Secretary—i.e., the 1985 Farm Bill amendment—they did raise this very complaint. *See* 54 Fed.Reg. at 43950 (Oct. 30, 1989) (comments to final rule).

residue standards applied to products produced in the United States; and ... [shall] have been processed in facilities and under conditions that are *the same as* those under which similar products are processed in the United States.[22]

Despite Congress' command to hold foreign producers of poultry destined for interstate commerce in this country accountable to "the same" standards as domestic producers of poultry destined for that market, in 1989 the Secretary and the Food Safety and Inspection Service ("FSIS") (collectively, the "Secretary") promulgated the challenged regulation, thereby retaining the subjective "at least equal to" standard.[23] Congress reacted to that effrontery the following year by enacting § 2507 of the Food, Agriculture, Conservation, and Trade Act of 1990 ("1990 Farm Bill").[24] In that section, Congress addressed the Secretary's interpretation, stating that "the regulation promulgated by the Secretary of Agriculture, through the [FSIS], with respect to poultry products offered for importation into the United States *does not reflect* the intention of the Congress."[25] It then "urge[d]"

---

[22]1985 Farm Bill, Pub.L. No. 99-198, § 1701, 99 Stat. 1633 (codified at 21 U.S.C. § 466(d)) (emphasis added).

[23]54 Fed.Reg. 43948 (Oct. 30, 1989). Specifically, the Secretary interpreted the foregoing statutory language as requiring that "[t]he foreign inspection system must maintain a program to assure that the requirements referred to in this section, *at least equal to* those applicable to the Federal System in the United States, are being met." *Id.* at 43951 (emphasis added).

The interim regulation was published in 1987. 52 Fed.Reg. 15963 (May 1, 1987). During the required notice and comment period, the FSIS received thirty-one comments on the proposed rule, more than 757 of which opposed the "at least equal to" language. Nonetheless, in the preamble to the final rule, the FSIS insisted that it did not believe that a literal application of the term "the same as" was the intent of Congress, although the FSIS acknowledged that "there are certain features that any system must have to be considered "the same as' the American system." 54 Fed.Reg. at 43951 (Oct. 30, 1989).

[24]Pub.L. No. 101-624, § 2507, 104 Stat. 3359 (1990).

[25]*Id.* (emphasis added). In its entirety, § 2507 of the 1990 Farm Bill reads:

(a) FINDINGS.—Congress finds that—

(1) in 1985 the [PPIA], an Act to maintain the integrity and wholesomeness of this Nation's food supply, was amended by the Food Security Act of 1985;

(2) the 1985 amendment provided that poultry products offered for importation into the United States shall be subject to the same inspection, sanitary, quality, species verification, and residue standards applied to products produced in the United States and that such products shall have been processed in facilities and under conditions that are the same as those under which similar products are processed in the United States; and

the Secretary, through the FSIS, to amend the regulation to reflect the true legislative intent.[26] The Secretary ignored Congress' entreaty, however, and allowed the regulation to remain unchanged.

Recognizing the impasse between the Legislative and Executive branches of the federal government, the Mississippi Poultry Association, Inc. and the National Broiler Council (collectively, "the Poultry Associations")—both non-profit trade associations whose members are domestic poultry producers and processors—turned to the third branch of government, filing suit in the Southern District of Mississippi. There the Associations sought and obtained a judicial declaration that the 1989 regulation implementing § 17(d) was arbitrary and capricious as contemplated by the Administrative Procedure Act.[27]

As a postscript, during the pendency of this litigation Congress once again amended § 17 of the PPIA. And once again Congress drew a sharp distinction between "the same" language and "equivalent to" language. As part of the North American Free Trade Agreement Implementation Act (the "NAFTA Act") Congress provided that poultry imports from Canada and Mexico "shall comply

---

(3) on October 30, 1989, the Secretary of Agriculture, through the [FSIS], ... promulgated a regulation implementing the 1985 amendment to that Act providing that a foreign inspection system seeking certification for export of poultry to the United States merely impose requirements at least equal to those applicable in the United States.

(b) SENSE OF CONGRESS.—It is the sense of the Congress that—

(1) the regulation promulgated by the Secretary of Agriculture, through the [FSIS], with respect to poultry products offered for importation into the United States does not reflect the intention of the Congress; and

(2) to urge the Secretary, through the [FSIS], to repeal the October 30, 1989 regulation and promulgate a new regulation reflecting the intention of the Congress.

*Id.*

[26]*Id.* Further, in the House Conference Report accompanying the 1990 Farm Bill, Congress declares that although certain technical deviations from United States standards, such as dye color and materials used for knives, may be acceptable, the "fundamental inspection system, intensity, procedures, and food safety standards, ... should be *the same as* those prevalent in the United States for any such country to be certified for export to the United States." H.R.CONF.REP. 916, 101st Cong., 2d Sess. 1222 (1990), *reprinted in* 1990 U.S.C.C.A.N. 4656, 5747 (emphasis added).

[27]5 U.S.C. §§ 500-706.

with [standards that are "the same" as those in the United States] *or* be subject to ... standards that are equivalent to United States standards."[28]

II

DISCUSSION

In the seminal case of *Chevron, U.S.A. v. Natural Resources Defense Council*[29] the Supreme Court established a two-step method for judicial review of an agency's interpretation of a statute that it administers. In devising this framework, the *Chevron* Court relied on basic principles of democratic government: Policy choices are for the political branches, and Congress is the supreme branch for making such choices.[30] Under *Chevron,* however, courts retain their traditional role to say "what the law is," that is, to interpret statutes.[31]

To give effect to the core democratic principle of congressional primacy, *Chevron* instructs reviewing courts first to use "traditional tools of statutory construction" to ascertain whether "Congress has directly spoken to the precise question at issue."[32] For if Congress has clearly expressed its intent in the plain language of the statute, "that is the end of the matter; for the Court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."[33] If, but only if, the language of the statute is determined to be either ambiguous or silent on the particular issue is the reviewing court to proceed to the second *Chevron* inquiry: "whether the agency's answer is based on a permissible construction of the statute."[34]

---

[28]NAFTA, Pub.L. No. 103-182, § 361(e), 107 Stat. 2123-24 (1993) (emphasis added) (codified at 21 U.S.C. § 466).

[29]467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

[30]*See id.* at 864-66, 104 S.Ct. at 2792-93. As the *Chevron* Court concluded: "Our Constitution vests such responsibilities in the political branches." *Id.* at 866, 104 S.Ct. at 2793 (quoting *TVA v. Hill,* 437 U.S. 153, 195, 98 S.Ct. 2279, 2302, 57 L.Ed.2d 117 (1978)).

[31]*Id.* 467 U.S. at 843 n. 9, 104 S.Ct. at 2799 n. 9.

[32]*Id.* at 842-43 & n. 9, 104 S.Ct. at 2799 & n. 9.

[33]*Id.* at 842-43, 104 S.Ct. at 2799.

[34]The *Chevron* Court's command that deference is due only when Congress has not spoken is quite blunt: "The judiciary ... *must* reject administrative constructions which are contrary to clear

In the instant case, the parties frame the "precise question at issue" as whether imported poultry products must be held to standards that are "the same as" the standards used in the federal program, or merely "at least equal to" such standards. Our task is more modest, however, as the Poultry Associations have launched only a facial challenge to the validity of the Secretary's regulation.[35] Accordingly, the "precise question" presented by this appeal is whether the Secretary's implementation of § 17(d) through an "at least equal to" standard is unambiguously foreclosed by the statutory language, "the same."[36]

A. TEXT

Taken out of context, the word "same" has a range of meanings stretching from "selfsame"

---

congressional intent." *Id.* at 843 n. 9, 104 S.Ct. at 2799 n. 9 (emphasis added). Such deference is due at this second step because Congress has by definition not addressed the question at issue. Hence, between the remaining actors—the courts and the agencies—the agencies have a greater claim to legitimacy to make policy choices than do the courts.

> Interestingly, because of the strictures of its first step, *Chevron* is not quite the "agency deference" case that it is commonly thought to be by many of its supporters (and detractors). *See* Thomas W. Merrill, *Judicial Deference to Executive Preference,* 101 YALE L.J. 969, 980-85 (1992) (empirical study of Supreme Court practice indicates that the application of *Chevron* has resulted in *fewer* acceptances of agency interpretations). The recent term of the Supreme Court indicates that this pattern still holds. *See, e.g., MCI Telecommunications Corp. v. American Telephone & Telegraph Co.,* --- U.S. ----, ----, 114 S.Ct. 2223, ----, 129 L.Ed.2d 182 (1994), (rejecting agency view); *Chicago v. Environmental Defense Fund,* --- U.S. ----, ----, 114 S.Ct. 1588, 1594, 128 L.Ed.2d 302, 312 (1994) (same); *John Hancock Life Ins. v. Harris Trust & Sav. Bank,* --- U.S. ----, ---- - - ----, 114 S.Ct. 517, 529-31, 126 L.Ed.2d 524, 544-46 (1993) (same).

[35]Had the Poultry Associations challenged the application of the instant regulation in a context that would require us to decide whether the foreign standards must be "identical" or merely some lesser degree of congruity, then we would have before us the "identicality" issue as pressed by the parties. That is not the case presented. Instead, although the Poultry Associations originally contested the "at least equal to" standard as applied, they dropped this challenge and moved for summary judgment. The Secretary also moved for summary judgments, claiming likewise that there was no dispute as to a *material* fact.

[36]*See, e.g., Environmental Defense Fund,* --- U.S. at ----, 114 S.Ct. at 1594, 128 L.Ed.2d at 312. The Supreme Court has recently stated the threshold inquiry in *Chevron* in terms of whether Congress has unambiguously foreclosed the interpretation offered by an agency. *See MCI Corp.,* --- U.S. at ----, 114 S.Ct. at ---- (concluding that the agency interpretation went "beyond the meaning that the statute can bear"); *Environmental Defense Fund,* --- U.S. at ----, 114 S.Ct. at 1594, 128 L.Ed.2d at 312 (same for interpretation that went "beyond the scope of whatever ambiguity" existed); and *John Hancock,* --- U.S. at ----, 114 S.Ct. at 531, 126 L.Ed.2d at 545 (same for interpretation that "exceeded the scope of available ambiguity").

through "identical" to the Secretary's proffered definition, "at least equal to."[37]  As a threshold matter there is a strong argument that the phrase "the same," in itself, unambiguously excludes "at least equal to" as an acceptable definition.  Reduced to essentials, although the word "same" is susceptible of conveying several meanings—possibly even equivalency—"same" and "identical" are synonyms and are treated as such in common usage.[38]  And of course common usage provides acceptable grounds on which to parse statutory terms into primary, secondary, and other meanings.[39]

That "at least equal to" is excluded as a proper synonym for "the same" in § 17(d) is further supported by the fact that in the PPIA Congress chose to use "at least equal to" as its term of art for *different* but equal or better, in the *intra* state context, juxtaposed to "the same," which Congress chose to use as its term of art for the standards to apply to imported poultry.  Hence, Congress itself has affirmatively acted to remove "at least equal to" (i.e., different but functionally equal or better) as one possible synonym in the set of all synonyms for "the same."  By reading the phrase "at least equal to" to be synonymous with "the same as," the Secretary would thus be going "beyond the scope of whatever ambiguity"[40] was present in the words, "the same."

---

[37]*See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2007 (1986).

[38]*See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1122-23, 2007 (1981).

[39]*See, e.g., Mallard v. United States Dist. Court,* 490 U.S. 296, 301, 109 S.Ct. 1814, 1818, 104 L.Ed.2d 318 (1989) (turning to "everyday speech" to determine which synonyms are closest to the statutory term "request";  disposition of case turned on definition of this term, which is subject to a meaning—perhaps a "secondary" one—that would have led to the opposite disposition of the case);  *Ardestani v. I.N.S.,* 502 U.S. 129, ----, 112 S.Ct. 515, 519, 116 L.Ed.2d 496, 504 (1991) (turning to context and a "natural reading" to conclude that statutory term "under", which the Court conceded has many different dictionary definitions, means "subject to" or "governed by");  *John Doe Agency v. John Doe Corp.,* 493 U.S. 146, 153, 110 S.Ct. 471, 476, 107 L.Ed.2d 462 (1989) (looking to "ordinary meaning" of statutory term "compilation").

> This approach applies even to claims by agencies that alternative dictionary definitions entitle them to deference.  *See, e.g., MCI Corp.,* --- U.S. at ----, 114 S.Ct. at ---- (looking to empirical analysis of dictionary definitions and structure of statute to reject dictionary definition proffered by agency);  *Mississippi, Office of the Governor, Div. of Medicaid v. Sullivan,* 951 F.2d 80, 82-83 (5th Cir.1992) (rejecting agency interpretation by using "ordinary meaning" to define methodology as meaning plural, not singular, processes).

[40]*Environmental Defense Fund,* --- U.S. at ----, 114 S.Ct. at 1594, 128 L.Ed.2d at 312 (using textual and structural analysis to reject agency's view as "beyond the scope of whatever ambiguity" existed in statute);  *see also, MCI Corp.,* --- U.S. at ----, 114 S.Ct. at ---- (using

Although the foregoing counsels concluding that the phrase "the same" does not include "at least equal to" as an acceptable synonym, this interpretation outside of the structural and historical context is insufficient, in itself, to dispose of this appeal. As noted, in support of his interpretation, the Secretary has offered alternative dictionary definitions that arguably make some sense under the statute at issue. Accordingly, we now turn "to the structure and language of the statute as a whole"[41] to ascertain Congress' intent regarding the meaning of "the same."

B. STRUCTURE AND HISTORY

Again, in the PPIA Congress used "at least equal to" for standards applicable to *intra* state poultry while using "the same" for standards applicable to imported poultry. As the Supreme Court has counseled, "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."[42] Accordingly, we must presume that Congress meant something different when it used both the phrase "the same" and the phrase "at least equal to" in the PPIA.

That presumption becomes conclusive in this case when the different language is read in light of the structure and history of the PPIA. The structure of the PPIA is plain: Domestic poultry producers who comply with state inspection programs that are "at least equal to" the standards in the

---

textual and structural analysis to conclude that agency's attempt to read "modify" to allow fundamental change "goes beyond the meaning that the statute can bear"); *John Hancock,* --- U.S. at ----, 114 S.Ct. at 531, 126 L.Ed.2d at 545 (concluding that agency's attempt to read statutory language "to the extent" to mean "if" "exceeded the scope of available ambiguity").

[41]*National R.R. Passenger Corp. v. Boston & Maine Corp.,* --- U.S. ----, ----, 112 S.Ct. 1394, 1402, 118 L.Ed.2d 52, 66 (1992); *see also, e.g., Dole v. Steelworkers,* 494 U.S. 26, 36, 110 S.Ct. 929, 935, 108 L.Ed.2d 23 (1990) (same); *Sullivan v. Everhart,* 494 U.S. 83, 89, 110 S.Ct. 960, 964, 108 L.Ed.2d 72 (1990) (same).

[42]*Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983) (quoting *United States v. Wong Kim Bo,* 472 F.2d 720, 722 (5th Cir.1971)); *see also, Environmental Defense Fund,* --- U.S. at ----, 114 S.Ct. at 1593, 128 L.Ed.2d at 311 (applying same in rejecting agency's interpretation); *North Haven Bd. of Education v. Bell,* 456 U.S. 512, 521, 102 S.Ct. 1912, 1917, 72 L.Ed.2d 299 (1982) (applying same); *Cf. Mattox v. F.T.C.,* 752 F.2d 116, 122 (5th Cir.1985) (concluding that 62-year period between passage of acts militated against reading the separate acts *in pari materia* ).

federal program may sell their products, but only *intra* state.[43] If a domestic poultry producer wishes to sell his product *inter* state, he *must* comply with "the same" standards that are embodied in the federal program.[44]

The history of the PPIA regarding imports is likewise plain. When the Secretary in 1972 adopted (and in 1989 readopted) standards for imported poultry he had two choices: Either to require imported poultry to comply with the standards applied to all poultry sold in interstate commerce—i.e., the federal standards—or to adopt an "at least equal to" standard as used for poultry sold in *intra* state commerce under state programs.[45] To the surprise and dismay of Congress and the domestic poultry industry, the Secretary followed the *intra* state, state-standards approach by promulgating the "at least equal to" standard.

Not to be outdone, Congress in 1985 rejected the "at least equal to" approach and explicitly provided that imported poultry must meet "the same ... standards applied to products produced in the United States."[46] The language of the statute is critical here because the *only* standards applicable to domestic poultry products sold in interstate commerce are the federal standards that make up the federal program: There are no parallel or alternative state programs or state standards applicable to poultry sold interstate. As all imported poultry is free to be sold in interstate commerce,[47] only one,

---

[43]*See* 21 U.S.C. § 454.

[44]*Id.*

[45]It should be noted here that neither the Secretary nor Congress had a workable option of requiring imported poultry producers to be part of the federal program; such a path would have required designation of foreign production facilities as "official establishments," with the concomitant expense of furnishing *United States* poultry inspectors during all hours of operation. *See* 21 U.S.C. §§ 453(p), 459, 465 and 9 C.F.R. §§ 381.25-39 (providing regulatory framework in which poultry must be produced and inspected at "official establishments"); 9 C.F.R. § 381.38(c) (providing that "official establishments" are entitled to up to eight hours of inspection services per shift without charge). Accordingly, as a practical matter—and as conceded by all parties—both the Secretary and Congress had two basic choices regarding imported poultry: To require such poultry to comply with the federal standards, or merely to meet any different standards that could be deemed equal to or better than the federal standards.

[46]21 U.S.C. § 466(d).

[47]By the fact of importation, this poultry is already part of foreign interstate commerce. Moreover, once the imported poultry is granted entry, it is free to be sold in domestic interstate commerce. 21 U.S.C. § 466(a) and 9 C.F.R. § 381.208.

inescapable conclusion can be reached: When Congress stated "the same" standards it meant for imported poultry to be held to those federal program standards.

The referent for the phrase "the same" is thus unmistakably clear. It is also clear that there would be no way for imported poultry sold interstate and domestic poultry sold interstate to be treated "the same" under the PPIA's structure if imported poultry were allowed to be imported under the "at least equal to" standard. Under such an approach, imported poultry, which the Secretary would attempt to regulate under myriad programs that are "at least equal to" the federal program, could move in interstate commerce, whereas domestic poultry that is likewise regulated under "at least equal to" programs could move only in *intra* state commerce.[48] In short, by adopting the "at least equal to" standard, the Secretary is or could be treating imported and domestic interstate poultry in a substantially different manner. Such diverse treatment can never properly be viewed as applying to imported poultry "the same ... st andards [as are] applied to products produced in the United States."[49] Accordingly, when § 17(d) is read in light of the structure of the PPIA as a whole, the unavoidable conclusion is that the words "the same" as used in § 17(d) cannot be stretched to include "at least equal to."

C. SUBSEQUENT ENACTMENTS

### 1. *1990 Farm Bill*

Two subsequent acts of Congress confirm our conclusion. The first occurred, not surprisingly, within one year following the Secretary's promulgation of the "at least equal to" regulation. In § 2507 of the 1990 Farm Bill Congress first reiterated the facts of this inter-branch dispute: In 1985 Congress had enacted a statute requiring imported poultry to meet "the same" standards as domestic interstate poultry, and in 1989 the Secretary had promulgated a regulation imposing merely "at least equal to" standards.[50] Congress then stated in plain, direct, and unequivocal

---

[48]*See* 21 U.S.C. § 454(a).

[49]21 U.S.C. § 466(d).

[50]1990 Farm Bill, Pub.L. No. 101-624, § 2507, 104 Stat. 3359 (1990).

language that the Secretary's regulation "does not reflect the intention of the Congress."[51]

Congress' store of "institutional knowledge" is important. Accordingly, courts have long held that subsequent legislation[52] is relevant to ascertaining the intent of Congress.[53]  Although subsequent legislation has been characterized as being anything from of "great weight"[54] or having "persuasive value,"[55] to being of "little assistance"[56] to the interpretative process, resolution of the proper weight to be accorded such legislation depends on the facts of each case.[57]  Here, given:  1) the substantial

---

[51]*Id.*  Relying on the "urge the secretary to change" language in § 2507, the Secretary makes much of the fact that Congress did not modify the operative language of § 17(d).  The argument appears to be that, if Congress wanted something different, why didn't Congress just amend the statute?  This argument is premised on a critical and faulty assumption—that § 17(d) as presently enacted *must be* ambiguous.  For if the present statute is not ambiguous, then placing the burden on Congress to enact a new law to correct this erroneous interpretation—which, according to this reasoning need not subsequently be followed *even if* unambiguous—would invert the relationship between Congress and the administrative agencies.

[52]Citing the "Sense of Congress" label included in § 2507, the Secretary appears to argue that § 2507 is "not law."  Such an argument ignores the fact that § 2507 has been subjected to the constitutionally mandated process:  It has been approved by both houses of Congress and has been signed into law by the President.  The use of "Sense of Congress" as a label in a subheading of this section would not, of course, negate these facts.  *See United States v. R.L.C.,* --- U.S. ----, ---- n. 5, 112 S.Ct. 1329, 1338 n. 5, 117 L.Ed.2d 559, 572 n. 5 (1992) (stating in response to a challenge to the use of a statute labeled a "Technical Amendments Act" that:  "But a statute is a statute, whatever its label").  In sum, constitutional process—not the label—is the operative fact.

[53]*E.g., Mallard,* 490 U.S. at 306-07, 109 S.Ct. at 1821 (using subsequent enactments of Congress to ascertain the meaning of statutory term);  *Bell v. New Jersey,* 461 U.S. 773, 785-86 n. 12, 103 S.Ct. 2187, 2194 n. 12, 76 L.Ed.2d 312 (1983) (same);  *Bowsher v. Merck & Co.,* 460 U.S. 824, 837 n. 12, 103 S.Ct. 1587, 1595 n. 12, 75 L.Ed.2d 580 (1983) (same).

[54]*Red Lion Broadcasting Co. v. F.C.C.,* 395 U.S. 367, 380-81, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969).

[55]*Bell,* 461 U.S. at 784-85, 103 S.Ct. at 2194.

[56]*Public Employees Retirement System v. Betts,* 492 U.S. 158, 168, 109 S.Ct. 2854, 2861, 106 L.Ed.2d 134 (1989).

[57]Subsequent enactments have been used to give effect to the intent of the current, not the enacting, Congress.  *See, e.g., Mallard,* 490 U.S. at 305-07, 109 S.Ct. at 1820-21 (using statutes enacted from 1956 to 1982 to interpret term in statute that was enacted in 1892).  Although cases such as *Mallard* would support giving effect to the intent of the Congress that enacted § 2507, there is authority for the proposition that we should give effect only to the intent of the *enacting* Congress.  As we are using § 2507 here solely for the limited purpose of ascertaining the intent of Congress in 1985—the "enacting" Congress—we decline to take sides in the "originalism"—"present intent" debate.  *Cf.* William N. Eskridge, Jr., *Overriding Supreme Court Statutory Interpretation Decisions,* 101 YALE L.J. 331, 402-05 (1991) (collecting and discussing cases that illustrate conflicting approaches and noting rising controversy that surrounds "present

overlap in membership between the Congress that passed the 1985 Farm Bill and the Congress that passed § 2507;[58] 2) the close temporal proximity between the passage of the 1985 Farm Bill and of § 2507; 3) the unmistakable specificity and directness with which § 2507 addressed the Secretary's interpretation; and 4) the alacrity with which Congress through § 2507 responded to the Secretary's interpretation, we find § 2507 to be highly persuasive, albeit not per se binding. Further, given the structure and history of the PPIA discussed earlier, we also conclude that § 2507 merely states the obvious: That the Secretary's adoption of the "at least equal to" standard "does not reflect" the intent of Congress as plainly expressed in § 17(d) of the PPIA.

## 2. *1993 NAFTA Act Amendments*

As part of the NAFTA Act, Congress in 1993 amended § 17(d) for a second time.[59] In construing these amendments, we must note as a threshold matter that certain special interpretive maxims apply to NAFTA.[60] Of relevance here, Congress enacted NAFTA Act pursuant to the Omnibus Trade Act of 1988, section 1103 of which provides that the benefits and obligations of a bill implementing a trade agreement shall apply "solely to the parties to the agreement, *if* such application is consistent with the terms of the agreement."[61] Further, § 102(a) of the NAFTA Act itself expresses mandatorily that it *shall not* be construed to amend or modify any law of the United States, "unless specifically provided for in this Act."[62] In sum then, the NAFTA Act is not meant to

---

intent" approach).

[58]Four hundred and thirty-five members of the Congress that passed § 2507 were also members of the Congress that added "the same" language to § 17(d) as part of the 1985 Farm Bill. *See* 1 U.S.C.C.A.N. at xliii to lxxv (1985) (membership of Congress in 1985) and 1 U.S.C.C.A.N. at xlii to lxxiii (1990) (membership of Congress in 1990).

[59]*See* NAFTA Act, Pub.L. No. 103-182, § 361(e), 107 Stat. 2123-24 (1993).

[60]As noted above, the relevant maxim derives from the fact that the NAFTA Act was passed pursuant to the Omnibus Trade and Competitiveness Act of 1988. The NAFTA Act was also passed pursuant to the Trade Act of 1974. *See* NAFTA, Pub.L. No. 103-182, § 101(a), 107 Stat. 2061 (citing § 1103 of the Omnibus Trade and Competitiveness Act of 1988 (codified at 19 U.S.C. § 2903) and § 151 of the Trade Act of 1974 (codified at 19 U.S.C. § 2191)).

[61]Codified at 19 U.S.C. § 2903(a)(3) (emphasis added).

[62]NAFTA Act, Pub.L. No. 103-182, § 102(a), 107 Stat. 2062 (1993).

affect United States law other than as "specifically provided."

Nonetheless, the NAFTA Act by its very terms "specifically provides" that "the same" as used in § 17(d) is distinct from an equivalency standard. Section 361(e) of the NAFTA Act commands in pertinent part that:

> (2)(A) ... all poultry ... [imported] into the United States from Canada and Mexico shall:
>
>> (i) comply with paragraph (1);  *or*
>>
>> (ii)(I) be subject to ... standards that are equivalent to United States standards;  and
>>
>> (II) have been processed in facilities and under conditions that meet standards that are equivalent to United States standards.[63]

The reference to "paragraph one" directs us to the phrase "the same" in § 17(d).[64] Thus the NAFTA Act amendments mandate that poultry imports from Canada and Mexico "shall comply with [standards that are "the same" as those in the United States] *or* be subject to ... standards that are equivalent to United States standards."[65] By juxtaposing "the same" standard with the "equivalent to" standard in the very language of the NAFTA Act amendments, Congress has thus shown—once again—that it did not intend to use "the same" in § 17(d) as synonymous with "at least equal to" or any other equivalency standard.

Of even greater significance, application of the Secretary's interpretation to the NAFTA Act amendments would violate "an elementary canon of construction[:]  that a statute should be interpreted so as not to render one part inoperative."[66] Stated simply, the NAFTA Act amendments provide that to import poultry products into the United States Canada and Mexico must meet either of two alternative standards:  an *equivalency* standard, or, under the Secretary's interpretation of "the same" language in paragraph one—nonsensically—an *equivalency* standard!  Obviously, such a

---

[63]NAFTA Act, Pub.L. No. 103-182, § 361(e), 107 Stat. 2124 (1993) (emphasis added).

[64]*See* 21 U.S.C. § 466(d)(1).

[65]NAFTA, Pub.L. No. 103-182, § 361(e), 107 Stat. 2123-24 (1993) (emphasis added).

[66]*Department of Revenue v. ACF Indust.,* --- U.S. ----, ----, 114 S.Ct. 843, 848-49, 127 L.Ed.2d 165, 174 (1994) (quoting *Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana,* 472 U.S. 237, 249, 105 S.Ct. 2587, 2594, 86 L.Ed.2d 168 (1985)).

construction would render the "comply with paragraph (1)" language of the NAFTA Act amendments redundant; sheer surplusage. Although the Secretary may believe that he is free to treat statutory language in such a manner, "[j]udges should hesitate so to treat statutory terms."[67] Indeed, we should do so only when such a result is "unavoidable."[68] And such a result may be avoided here by refusing to allow the phrase "the same" to be interpreted to mean "equivalent."

A few final comments are indicated. The dissent attempts to avoid the statutory language of the NAFTA Act amendments by positing that these amendments were enacted only as a cautionary response to the instant litigation.[69] Had this been the case, Canada and Mexico would have been *fully protected* by language permitting them to meet an "equivalent to" standard—the very language provided in subpart (ii) of § 361(e)(2)(A) of the NAFTA Act. Thus, under the very reasoning of the dissent, the words "comply with paragraph (1)" of subpart (i) of § 361(e)(2)(A) are still surplusage. Indeed, even under this reasoning the phrase "comply with paragraph (1)" makes sense *only if* paragraph one establishes a different standard than the equivalency standard in § 361(e)(2)(A)(ii); i.e., an identicality standard.

Nonetheless, the dissent insists that the NAFTA Act amendments contain no surplusage. In an argument that cannot be paraphrased, but must be quoted, the dissent asserts that:

> Section 466(d) states that Mexico and Canada may meet standards for poultry production that are either the same as *or* equivalent to those required in the United States. Use of the disjunctive here gives rise to only one reasonable explanation. Regardless of whether one defines the word "same" as identical or equivalent, the provision contains a redundancy. Under either approach, foreign poultry products that are the same as our own are also equivalent to our own.[70]

---

[67]*Ratzlaf v. United States,* --- U.S. ----, ----, 114 S.Ct. 655, 659, 126 L.Ed.2d 615, 622 (1994) (rejecting government's proffered interpretation).

[68]*E.g., United States v. Chen,* 913 F.2d 183, 190 (5th Cir.1990) (quoting *Duke v. University of Tex.,* 663 F.2d 522, 526 (5th Cir.1981)) ("It is well established that a statute should be construed so that each of its provisions is given its full effect; interpretations which render parts of a statute inoperative or superfluous *are to be avoided.*") (emphasis added).

[69]We note that this contention was first raised during the en banc oral argument by counsel for the Secretary. When counsel was pressed as to whether he had any documentation for this assertion, he replied that he had none.

[70]Post at 6295.

Apparently, then, to render surplusage irrelevant the dissent would equate "poultry products" with the standards used to inspect poultry products.  But we do not sit today to decide whether one batch of poultry products is the "same as" or "equivalent" to another.  Rather, we must decide whether the Secretary may allow importation of poultry inspected under standards different but "at least equal to" rather than "the same as" our own.  And, as the vigorously contested nature of the instant litigation demonstrates, this is indeed a distinction *with* a difference.

In the end, we find unpersuasive the dissent's attempt to distinguish the NAFTA Act amendments.  The fact remains that in the NAFTA Act Congress plainly stated—for the third time in eight years—that the term "the same" is language of identicality, as distinguished from the language of equivalency, whether it be "at least equal to" or "equivalent to."  Were we to ignore these statements, we too would be flouting the will of Congress.  This we cannot do.

III

OTHER MATTERS

In the analysis contained in Part II(B) above, we concluded that the history and structure of the PPIA demonstrated that, as used in § 17(d), "the same" unambiguously forecloses "at least equal to" as a permissible interpretation.  We further observed in Part II(C) that this conclusion is expressly confirmed by two subsequent acts of Congress.  But inasmuch as we have taken this case en banc, we think it prudent to take another critical look at the arguments advanced by the Secretary.

A. LEGISLATIVE HISTORY

The Secretary insists that the legislative history of the 1985 Farm Bill supports his position that "the same" is here ambiguous enough to encompass "at least equal to."  Initially, we note that the Supreme Court has long counseled that appeals to legislative history are not well taken when the statutory text is unambiguous.[71]  Although this is a sound rule, it is not an absolute one.[72]  But even

---

[71]*E.g., Barnhill v. Johnson,* --- U.S. ----, ----, 112 S.Ct. 1386, 1391, 118 L.Ed.2d 39, 48 (1992) (stating same);  *Wisconsin R.R. Comm. v. C.B. & Q. R.R.,* 257 U.S. 563, 589, 42 S.Ct. 232, 238, 66 L.Ed. 371 (1922) (refusing to consider legislative history when statute is clear and observing that legislative history should be used only to resolve doubt, not create it).  The Supreme Court has stated this rule in perhaps its most emphatic fashion in the recent case of *Connecticut Nat'l Bank v. Germain,* --- U.S. ----, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992):

if we were to consider this the "exceptional case" in which—despite unambiguous text—legislative history may be considered, we would find that its teaching is not nearly as lucid as the Secretary would have us believe.

The legislative history discloses that when the 1985 Farm Bill was introduced to the Senate Committee on Agriculture, Nutrition, and Forestry, the amendment to § 17(d) contained "at least equal to" language.[73] Through "technical and clarifying" amendments on the floor of the Senate, the Chairman of this committee, Senator Jesse Helms,[74] deleted the phrase "at least equal to" and replaced it with "the same." This change occurred without any debate other than the Chairman's statement that "the same" needed to be added to reflect the *original* intent of the committee.[75] In a rather astonishing bit of legal legerdemain, the Secretary posits that this lack of recorded floor debate indicates that Congress did not think this change significant; hence, argues the Secretary, Congress itself must have viewed the new and the old terms as synonymous. We find this preposterous; in fact, we read this snippet of legislative history to support the exact opposite inference.[76]

> [I]n interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and time again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: "judicial inquiry is complete.'

*Id.* at ----, 112 S.Ct. at 1149, 117 L.Ed.2d at 397-98 (citations omitted) (rejecting appeal to legislative history).

[72]*See, e.g., In re Sinclair,* 870 F.2d 1340, 1341-42 (7th Cir.1989 (per Judge Easterbrook) (collecting Supreme Court cases containing conflicting lines of authority).

[73]S.REP. NO. 99-145, 99th Cong., 1st Sess. 339-40 (1985), *reprinted in* 3 U.S.C.C.A.N. 2005-06 (1985).

[74]*See* 1 U.S.C.C.A.N. at xiv (1985) (listing Senator Helms as Chairman of the Committee on Agriculture, Nutrition, and Forestry).

[75]131 Cong.Rec. 33358 (Nov. 22, 1985).

[76]Indeed, there is evidence in the record that confirms this inference. Specifically, when the interim rule adopting the "at least equal to" standard was published in 1987, the very sponsor of the 1985 amendments to the PPIA—Agriculture, Nutrition, and Forestry committee member Senator David Pryor—wrote to the Secretary. His letter states in pertinent part:

> It is my understanding that, notwithstanding the clear language of the new poultry import requirements, FSIS plans to interpret the law to permit importation

The fact that the chairman of the cognizant committee presented the technical and clarifying amendments on the floor of the Senate to the entire body, and took the opportunity to focus his remarks on the need to delete "at least equal to" and replace it with "the same," thereby removing any doubt about the intention of the committee *ab initio,* demonstrates beyond cavil the importance that the committee placed on this distinction. That the Senate as a whole apparently understood and accepted this important change proffered on behalf of the committee by its chairman—and saw no need for quibbling debate—is strong evidence that the sense of the committee knowingly and intentionally became the sense of the Senate.

The fact that Congress changed the language from "at least equal to" to "the same" is equally strong evidence of that body's explicit rejection of the "at least equal to" standard. We are convinced that the fact that Congress went to the trouble of effecting this change indicates that Congress itself clearly understood these two standards to be different, not synonymous.

The Secretary defies logic in his attempt to refute these common-sense inferences, not with legislative history at all, but with some implied *legislative silence* theory created from thin air on the basis of an absence of recorded floor debate. We discern no basis whatsoever for construing lack of debate or silence as grounds from which to divine Congressional intent—particularly when, as here, the chairman of the cognizant committee expressly stated that the amendment was necessary *to reflect the original intent of that committee!* The only valid inference to be drawn from this historical glimpse is that the significance of the phrase "the same" had already been worked out in the final committee process—determining to use "the same" in juxtaposition to "at least equal to," not as a synonym for it. Thus the absence of debate on the floor of the Senate actually confirms the existence

---

of poultry that has been prepared under conditions that are "equal to" but not "the same as" the conditions prevalent in this country....

As the principal sponsor of the Farm Bill amendments to the poultry inspection law, I can assure you it was my intent that poultry produced in facilities and by procedures that do not mirror those in the United States shall not enter this country....

Mr. Secretary, I knew what I wanted to accomplish when I introduced the poultry import amendment to the Farm Bill, and *I made my colleagues aware of its intent also....*

of congressional intent rather than the lack thereof.

The Secretary's argument that somehow this vignette of legislative "un-history" reflects Congressional ennui simply will not fly. If the absence of debate reflects anything, it is consensus and possibly even unanimity. Congress always intends the plain wording of the statute, which in this instance commands the conclusion that "the same" is used to prohibit differences while "at least equal to" is used to signal that differences are permissible (albeit here in *intra* state commerce only), as long as the standards that are different are substantively equal to or better than the federal standard. Thus, when we go to the statute, we find that the precise placement of "the same" within the structure of the PPIA confirms at least one thing absolutely: Whatever else "the same" may be synonymous with, it clearly and unambiguously *cannot* be synonymous with "at least equal to" in the PPIA!

## B. *BOSTON & MAINE* AND THE "DICTIONARY RULE"

The Secretary cites *National R.R. Passenger Corp. v. Boston & Maine Corp.*[77] for a bold proposition: That the presence of alternative dictionary definitions "each making some sense under the statute" *compels* a conclusion that "the same" is ambiguous. According to the Secretary, as there is a dictionary definition here that supports an equivalency standard, we must thus defer to the Secretary's interpretation as a "permissible" one under the PPIA.[78]

The Secretary has proposed nothing short of a per se "dictionary rule": If a dictionary (or dictionaries) contains more than one definition that makes some sense under the statute, then it is ambiguous; hence, the agency is due deference under *Chevron.* As almost every word in the dictionary is given more than one sense-making definition, such an approach would effectively preclude courts from ever reaching, much less using, "traditional tools of statutory construction" such

---

[77]--- U.S. at ----, 112 S.Ct. at 1402, 118 L.Ed.2d at 66.

[78]As noted, the word "same" has been defined to mean, inter alia, everything from "resembling in every way" to "not different in relevant essentials." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2007 (1986). According to the Secretary, imposing an "at least equal to" standard makes imported poultry "not different in relevant essentials" from domestic poultry: Both are equally safe for consumption. *Ergo,* deference is due here as the "at least equal to" standard would "make some sense" under the PPIA.

as canons, structure, or history, to ascertain the intent of Congress.[79]

In addition, such an approach would also effect a radical shift in power from Congress to administrative agencies, as follows:  For the agency interpretation to trump Congress, the agency must be entitled to deference;  for the agency to be entitled to deference, there must be ambiguity;  if every word for which secondary and tertiary meanings are to be found in some English language dictionary is deemed to be ambiguous for *Chevron* purposes, essentially every non-technical word in every statute would have the potential of being ambiguous;  consequently, the agency's choice of definition would trump Congress' word usage every time—subject only to the vague caveat that the agency's choice "makes some sense" under the statute.

Not surprisingly, the Secretary's plea for adoption of a "dictionary rule" is interdicted by binding precedent.  In *Chevron* itself the Court explicitly counsels reviewing courts to "employ[ ] traditional tools of statutory construction" to ascertain whether Congress expressed its intent on "the precise question at issue."[80]  Such tools have been employed ever thus in *Chevron* analyses.[81]  Indeed *Boston & Maine*—the very case cited for the so-called "dictionary rule"—instructs reviewing courts

---

[79]The Secretary's argument could also be taken as a claim that his choice of definitions is "permissible" unless tools such as canons, structure, or history show that Congress had a contrary intent.  If this were the Secretary's argument, then we would find it to be of little significance: Using tools to ascertain the intent of Congress to determine whether a construction is permissible—as opposed to whether a term is ambiguous—seems to be a distinction without much difference.  Under such an approach "permissibility" and "ambiguity" would become merely flip sides of the same coin—i.e., there is no "permissibility" absent ambiguity as determined by the traditional tools.

Perhaps realizing the foregoing, the Secretary is here pressing the so-called "dictionary rule" in its strong form:  That such a rule *precludes* the use of "traditional tools of statutory construction."

[80]*Chevron,* 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9.

[81]For a sampling of post-*Chevron* cases in which the Court has used such tools to reject an agency's interpretation, see *Department of Labor v. Greenwich Collieries,* --- U.S. ----, ---- - ----, 114 S.Ct. 2251, ----, 129 L.Ed.2d 221 (1994) (looking to historical meaning of term "burden of proof");  *Environmental Defense Fund,* --- U.S. at ----, 114 S.Ct. at 1590-94, 128 L.Ed.2d at 307-12 (applying canons of construction);  *E.E.O.C. v. Arabian Am. Oil Co.,* 499 U.S. 244, 248-58, 111 S.Ct. 1227, 1230-35, 113 L.Ed.2d 274 (1991) (using canon and textual analysis);  *Dole,* 494 U.S. at 35-43, 110 S.Ct. at 934-38 (using canons, structure, and purpose of act);  *Betts,* 492 U.S. at 165-75, 109 S.Ct. at 2860-65 (applying canons and "plain language" of statute);  *INS v. Cardoza-Fonseca,* 480 U.S. 421, 455-59, 107 S.Ct. 1207, 1225-27, 94 L.Ed.2d 434 (1987) (using canons and structure of statute).

when interpreting a statute to look "to the structure and language of the statute as a whole."[82]  Any doubt on this score—assuming there ever was any reason for such doubt—was recently settled by the Supreme Court in *MCI Corp. v. American Telephone & Telegraph,*[83] in which the Court explicitly and emphatically states that *Boston & Maine* does not stand for any so-called "dictionary rule." Accordingly, we decline the Secretary's invitation to adopt such a rule as the proper method for interpreting the PPIA.

C. GOOD POLICY, BAD POLICY, AND THIS COURT'S ROLE

The Secretary strenuously argues that an "at least equal to" standard protects American consumers from "unhealthful, unwholesome, or adulterated" products while allowing foreign poultry products to be imported at reasonable costs.  In contrast, the Secretary asserts that imposition of "the same" standards with accompanying "jot for jot" identicality would raise these costs to a prohibitive, protectionist level without any concomitant increase in the safety and quality of the imported product. According to the Secretary, holding foreign poultry producers to "the same" standards even contains the seed of an absurdity:  That such a practice would prohibit the importation of poultry products produced under *superior* foreign standards!

Even though there is superficial appeal to some of the Secretary's policy arguments, they are overdrawn.[84]  As a preliminary matter, we observe that although the Secretary places much weight

---

[82]*Boston & Maine,* --- U.S. at ----, 112 S.Ct. at 1402, 118 L.Ed.2d at 66.

[83]--- U.S. at ----, 114 S.Ct. at ----.

[84]For example, the NAFTA Act amendments partially undermine the Secretary's claim of "dire consequences" flowing from implementation of "the same" standards.  Under these amendments Canada, which currently accounts for 287 of imported poultry, *see* UNITED STATES DEPARTMENT OF AGRICULTURE, ECONOMIC RESEARCH SERVICE, FOREIGN AGRICULTURAL TRADE OF THE UNITED STATES, FISCAL YEAR 1992 SUPPLEMENT at 12, 310 (1992), will remain free to import under an "equivalency" standard.  *See* 21 U.S.C. § 466(d)(2)(A)(ii) (West Supp.1994) (codifying NAFTA Act amendments).

Moreover, the NAFTA Act also illustrates the proper process and forums for addressing the Secretary's trade concerns.  As part of NAFTA, the President negotiated a trade treaty in which the United States obtained reciprocal benefits.  This treaty and its implementing legislation were then submitted to Congress for debate and approval.  In contrast, here the Secretary made a *unilateral* decision that requiring "identical" standards would engender unacceptable, protectionist trade consequences.  When such a decision is made in contravention of a statute, then this approach—in addition to undermining the

on his prohibiting-superior-standards-is-absurd argument, he has failed to cite even one instance in which a foreign country *actually* uses a superior standard. All we have been offered is hypotheticals. As the Secretary must certify the production and inspection practices in foreign countries—and hence is presumably familiar with such practices—we find this omission strange.

In addition, we note that the Secretary's "jot for jot" concern misapprehends our holding. All we hold today is that the plain language of the "the same" in the PPIA unambiguously forecloses the Secretary from adopting an "at least equal to" standard for imported poultry. Thus what is statutorily proscribed is the Secretary's current practice of certifying foreign programs in globo as "at least equal to" the federal one, with the accompanying allowance of wholesale, unjustified or unexplained variation from federal standards.

Concluding that such wholesale variation is proscribed does not mean, however, that the phrase "the same" precludes any and all variation from the federal standards. Applications requiring us to ascertain the precise congruity required by the phrase "the same" in context are not before us; thus, the degree of variation allowed—and whether such variation rises to the level of effectively adopting the proscribed "at least equal to" scheme—cannot be defined here.[85] We do note, though, that certain technical variations do not, for example, prevent foreign standards from being considered "the same" as federal standards.[86] The Secretary also has the authority to approve discrete, authorized variations of the type commonly approved under the federal standards.[87] But what we

---

trade-negotiation process—also improperly bypasses the political process.

[85]Moreover, it is for the Secretary in the first instance to draft new regulations defining the degree of variation, if any, allowed.

[86]In apparent recognition of this limited flexibility, Congress in the House Conference Report accompanying the 1990 Farm Bill declares that certain technical deviations from United States standards, such as dye color and materials used for knives, may be acceptable. H.R. CONF.REP. 916, 101st Cong., 2d Sess. 1222 (1990), *reprinted in* 1990 U.S.C.C.A.N. 4656, 5747 (emphasis added). In addition, many of the standards embodied in the federal program are themselves stated flexibly, in terms of "minimums," "suitability," "acceptability," or "good commercial practices." *See* 9 C.F.R. §§ 381.36(e)(1)(iii), 381.45, 381.36(c)(vii) (stating standards in terms of "minimums"); 381.53(i) ("suitability"); 381.53(i) ("acceptability"); 381.65(c) ("good commercial practices").

[87]The federal program contains a global waiver provision, 9 C.F.R. § 381.3(c), which the Secretary has interpreted to allow domestic poultry producers who are part of the federal

have here goes well beyond that: It is effectively the introduction of a wholly *different* scheme of regulation that—while it may arguably be a better scheme—is not the one authorized or established by Congress. Beyond disallowing this scheme we need not—and thus do not—go.

As a parting comment, we also observe that the Secretary's arguments fail to account for the various legitimate reasons why Congress might want to hold imported poultry to the federal standards. For example, requiring such congruity between foreign and federal standards means that *all* poultry—domestic and foreign—sold *inter* state must be produced and inspected according to *one* set of rules. Accordingly, such an approach maintains uniformity in the national market, thereby presumably engendering the lowered information costs and enhanced consumer confidence commonly associated with such uniformity.[88]

In addition, adopting such an approach offers the traditional advantage associated with "bright line" rules—agency personnel would no longer be required to make subjective, fact-specific judgments as to whether one country's standards are somehow in globo "at least equal to" federal standards. If we operate from the uncontested assumption that the Secretary has devised a federal program that ensures safety, then lessening of subjectivity here also reduces the risk that unsafe products might be imported—i.e., that agency personnel might err, even once, in concluding that a

_____

program, and who meet the myriad standards embodied in that program, to comply with stricter state standards as well. Hence, these producers are free to incorporate discrete variations that are superior to the federal standards without forfeiting their ability to sell their products in interstate commerce. Clearly, then, foreign poultry producers held to "the same" standards as those embodied in the federal program may likewise have some flexibility under these very standards—including the flexibility to produce poultry for export to this country inspected under standards containing discrete variations that the Secretary determines to be clearly superior to our own.

> The foregoing makes explicit what one would think is an elementary point: That the Secretary controls the standards for the federal program, subject only to the caveat that such standards must be consistent with the PPIA. Accordingly—through such control—the Secretary still effectively determines the standards that foreign poultry producers must meet to import poultry.

[88]We note that similar concerns led Congress to decide that domestic poultry produced under state programs "at least equal to" the federal program would not be allowed to enter interstate commerce. *See* H.R. No. 1333, 90th Cong., 2d Sess. (1968), *reprinted in* 3 U.S.C.C.A.N. 3434 (1968) (concluding that such entry would have added another layer of complexity to the regulation of food products and may have confused consumers).

foreign program which differs substantially from our own nevertheless offers safety standards "at least equal to" the federal program.[89]

Finally, we note that—as a matter of policy—there would be little reason for the Secretary to single out domestic "state program" poultry producers, who must likewise meet an "at least equal to" standard to sell intrastate, and prevent them from entering the interstate market. Of course, there is a simple rebuttal to this argument: The statute prevents such producers from selling their products interstate. And that rebuttal applies equally to the Secretary's impassioned plea for the "at least equal to" standard for foreign poultry producers: The statute flatly forbids it! These points place the foregoing policy discussion in proper perspective. Although such a discussion is helpful to our understanding of the PPIA and § 17(d)—and is necessary as a check for any "absurdities"—these policy concerns cannot control the disposition of this case. Policy choices are for Congress—not the courts. And here Congress has chosen—twice.

IV

CONCLUSION

As judges we are bound to implement the policy choices of Congress, no matter how disfavored those choices may be in certain quarters. Although the Secretary makes a colorable argument that the "at least equal to" standard is the *better* one, it simply is not the role of the court to decide which of the two other branches has proposed the preferable rule. Congress has made clear that "the same" precludes adoption of an "at least equal to" standard for imported poultry, and the fact remains that it is Congress that has the right to make this choice, even if it may ultimately prove to be ill-advised.

For the foregoing reasons, the district court's summary judgment holding that the Secretary's 1989 regulation implementing § 17(d) was arbitrary and capricious and thus invalid is

AFFIRMED.

---

[89]A whole host of other considerations may explain why Congress decided to foreclose the "at least equal to" approach for imported poultry. For example, linking foreign and domestic standards forces the Secretary to consider matters such as how the regulations would "play in Paris." Such considerations may thus encourage the Secretary to avoid the bureaucratic tendency of imposing overly particularistic regulations on domestic producers.

PATRICK E. HIGGINBOTHAM, Circuit Judge, with whom POLITZ, Chief Judge, REAVLEY, E. GRADY JOLLY, DAVIS, EDITH M. JONES and RHESA HAWKINS BARKSDALE, Circuit Judges, join dissenting:

Attention to text as an Act of Congress or as an organic statute such as the United States Constitution is not a matter of choice for federal judges. The judiciary cannot claim legitimacy for decisions that do otherwise. In recent years, this language of judicial modesty with its focus on text has become widespread. For those who would reach for a larger judicial role, there are at least two tools of choice. First, a flood of legalisms and words that abstract and shrink the visage of textual command—often accompanied by unguided meanderings through legislative history. Second, there is the effort to turn the enterprise on itself by an exacting literalism that refuses to read words in context. Perhaps in the long run the greater threat comes from the second method. This is because it is employed by not only those who willfully seek to escape the fetters of text, but also those seduced by its claimed adherence to textual limitations. Until today, however, I had never seen both techniques appear in a single opinion.

This case is simple. Congress has insisted that foreign poultry meet the "same" standards as domestic poultry.[1] It did so in a statute addressed to "unwholesome, adulterated or misbranded poultry products."[2] Our court today holds that under this statute, the Department of Agriculture must forbid the importation of all foreign poultry produced by quality standards higher and lower than those in the United States. It reads "same" standards to mean identical processes and identical plants. Make no mistake about it, as the majority interprets the statute, virtually all importation of poultry is illegal. The majority insists on this literalism despite the common sense reading of "same" in the context of standards of quality to mean the same minimum level of wholesomeness, that is, "at least equal to." This absurdity is a lion in the street for the majority, and it never deals with it. It does not because it cannot. The Department of Agriculture has implemented the statute by regulations that allow importation of poultry produced by standards "at least equal to" our own.[3] Dictionaries of the

[1] 21 U.S.C. § 466(d).

[2] 21 U.S.C. § 451.

[3] 9 C.F.R. § 381.196.

English language permit not "different in relevant essentials," or "equivalent" as meanings of the word "same."[4] This reference to dictionary meanings is quite different from a game-like use of "modify."[5] Rather, these are meanings as old as the republic. The choice of meanings is found in context.

It is fair to ask what the Department of Agriculture can do under the majority opinion. The majority attempts to whistle past the absurdity. It does so by suggesting that somehow the Secretary has flexibility to avoid its virtual ban on foreign poultry. The difficulty is that the premise of striking down the regulation is that the "at least equal to" language of the regulation is not a permissible reading of the statute's insistence upon the same standards. And reading the statute to insist upon identical standards is a virtual ban on importation of poultry.[6] The regulation, the majority says, is invalid because the regulator has impermissibly attempted to escape the exacting requirement of identicality or sameness. Yet, somehow we are to believe, the regulator, tied to the requirement that it insist upon identical standards, may avoid the absurdity.

Deny, deny, explain, explain—the inescapable reality is that under the majority's view, we must tell France and Israel, for example, that they may not import poultry into the United States because their standards for cleanliness and wholesomeness are higher or lower than those in the United States. The standards are not, and it is doubtful if they could be, implemented in identical "facilities" and under identical "conditions,"[7] as the majority insists they must be. Further, by the

---

[4]*See, e.g., Webster's Unabridged Third New International Dictionary* 2007 (Merriam 1961) (including as definition of same "not different in relevant essentials," "closely similar," and "equivalent"); *The Oxford English Dictionary* 428 (2d ed. 1989) (defining "same" as, among many other things, "equally acceptable ... or indifferent"). *See also The American Heritage Dictionary* 1088 (2d ed. 1982) (providing "similar in kind, quality, quantity, or degree" as definition of "same"); *The Random House College Dictionary* 1165 (Rev. ed. 1982) (defining "the same" as "in the same manner; in an identical or similar way").

[5]*See MCI Tel. Corp. v. American Tel. & Tel. Co.,* --- U.S. ----, ----, 114 S.Ct. 2223, 2229, 129 L.Ed.2d 182 (1994) (noting that single dictionary defining "modify" in way that "contradicts virtually all others" does not create statutory ambiguity but "a selection between accepted alternative meanings shown as such by many dictionaries" would).

[6]The majority relies on the Secretary's own regulation for its claim of flexibility. *See, e.g.,* slip opinion at 6285-6286 (citing 9 C.F.R. § 381.3(c)). The majority thus vacillates on the discretion available to the Secretary under an identicality standard.

[7]21 U.S.C. § 466(d)(1).

majority opinion, we allow Canada and Mexico to meet some undefined, but lesser standard. First the panel opinion, and now the *en banc* opinion, hints at a latent congressional purpose of trade protectionism. It is indeed a curious blend of protectionism that would protect American poultry interests from the threat of foreign poultry that is superior because it is healthier for the consumer. This insistence that a foreign producer lower its standards of health to meet the statutory command of sameness may be a form of trade protectionism, but it remains an absurdity.

I.

Our task is a simple one. The PPIA subjects foreign poultry to the "same" standards, and requires that such poultry be produced under the "same" conditions and in the "same" facilities, as domestic poultry.[8] The Secretary of Agriculture's regulation defines "same" as "at least equal to."[9] We must decide whether the two conflict.

Dictionaries offer several definitions of the word "same." These cluster into three categories of meaning. One is "selfsame," which suggests unity of identity.[10] The majority does not argue that foreign nations must produce poultry in American facilities. A second definition is "identical."[11] Such a definition would ban foreign poultry produced under better conditions, in better facilities, and under higher standards than American poultry. There are two reasons to believe Congress never intended this result. First, even if Congress wished to limit importation of foreign chickens, it is unlikely that it would do so by excluding from the domestic market foreign poultry products *better* than our own. Second, and far more important to the present analysis, Congress made no indication whatsoever that it intended to embed a protectionist measure in a law designed for the related purposes of promoting

---

[8]21 U.S.C. § 466(d).

[9]9 C.F.R. § 381.196.

[10]*Webster's, supra* note 4, at 2007. Unlike Webster's aberrant definition of "modify," *see MCI Tel. Corp. v. American Tel. & Tel. Co.,* --- U.S. ----, ----, 114 S.Ct. 2223, 2229, 129 L.Ed.2d 182 (1994), the multiple meanings of "same" appear in myriad English dictionaries. *See* sources cited *supra* note 4.

[11]*Webster's, supra* note 4, at 2007.

health and protecting the integrity of the domestic poultry market.[12]

A third definition of "same" is "not different in relevant essentials," "closely similar," and "equivalent."[13] Conditions, facilities, and standards at least equal to our own are not different in relevant essentials. They are the *same* minimum standards. They would produce chickens that are safe for consumption, thereby preserving confidence in the American poultry market. The Secretary's definition therefore comports with the most plausible definition of the word "same" as used in § 466(d) of the PPIA.

The question before us is not, however, whether we would select the definition of "same" that the Secretary did. Rather our directive is to determine whether Congress chose among the above definitions. If the statute is ambiguous, and if the Secretary adopted a reasonable interpretation of it, we must defer to his expertise:[14]

> If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.[15]

---

[12]The purposes of the Act were, first, to promote the health and welfare of American consumers by assuring that the poultry products they eat are safe and, second, to protect the domestic market for poultry products by guaranteeing their quality. Congress' recitation of these purposes reflects their close relationship:

> Unwholesome, adulterated, or misbranded poultry products impair the effective regulation of poultry products in interstate or foreign commerce, are injurious to the public welfare, destroy markets for wholesome, not adulterated, and properly labeled and packaged poultry products, and result in sundry losses to poultry producers and processors of poultry and poultry products, as well as injury to consumers.

21 U.S.C. § 451.

[13]*Webster's, supra* note 4, at 2007.

[14]The law has long required us to defer to an administrative agency's reasonable interpretation of an ambiguous term in a statute that the agency administers. *See, e.g., National R.R. Passenger Corp. v. Boston & Maine Corp.,* --- U.S. ----, ----, 112 S.Ct. 1394, 1402-03, 118 L.Ed.2d 52 (1992); *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843-44, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984).

[15]*Chevron, U.S.A.,* 467 U.S. at 843-44, 104 S.Ct. at 2781-82 (citations omitted).

Under this approach, I would have thought the validity of the Secretary's definition of "same" beyond question.

## II.

## A.

I do not pretend to understand the majority opinion. It appears to make two arguments in support of its conclusion that the word "same" means "identical." First, the majority insists that its view is supported by consistent use of language. The argument goes that Congress allows each state to set standards "at least equal to" the federal ones for producers whose poultry will remain within a state but Congress applies a single federal regulatory scheme to poultry destined for interstate commerce. The term "at least equal to," however, merely puts in place a floor, as do standards generally. Poultry sold interstate must meet the federal standards under the direct supervision of federal regulators. States are free to ensure on their own that the poultry produced and consumed within their borders meets the federal standards. But all domestic poultry must meet the same standards.

The error in the majority view is manifest in the statute regulating importation of foreign poultry. Congress' insistence that foreign poultry must meet the same standards as domestic poultry operates on the premise that all domestic poultry must meet the same standards—a premise that is sound beyond cavil. The statute simply requires that foreign poultry must meet the same floor as domestic poultry. The statute requires only that foreign poultry "be subject to the same ... standards applied to *products produced in the United States* and have been processed in facilities and under conditions that are the same as those under which similar products are *processed in the United States.*"[16] The statute does not recognize the majority's distinction between federal and state standards. It requires foreign poultry to meet the single set of standards for domestic poultry production—foreign poultry must meet the same floor for quality. That this is so is critical—the statute itself accepts as one the insistence upon "same" and "at least equal to." Yet, today we hold that the regulators cannot also do so.

---

[16]21 U.S.C. § 466(d) (emphasis added).

The majority's interpretive problems arise because the complex regulatory scheme it envisions is the product of judicial inventiveness that denies effect to plain language. Congress altered the act to require foreign nations to perform particular kinds of quality inspections on imported poultry. The statute had contained general requirements:

> No slaughtered poultry, or parts or products thereof, of any kind shall be imported into the United States unless they are healthful, wholesome, fit for human food, not adulterated, and contain no dye, chemical, preservative, or ingredient which renders them unhealthful, unwholesome, adulterated, or unfit for human food and unless they also comply with the rules and regulations made by the Secretary of Agriculture to assure that imported poultry or poultry products comply with the standards provided for in this chapter.[17]

The amendment insists that foreign poultry be subjected to the same "inspection, sanitary, quality, species verification, and residue *standards* " as American poultry.[18] In other words, Congress' concern lay with setting out the list of inspection activities foreign nations must undertake. Foreign poultry producers now have to inspect their facilities and poultry in much the same way as American poultry producers.

The amendment to the PPIA originally contained the term "at least equal to." Adoption of the word "same" followed from "two technical amendments" Senator Jesse Helms suggested to the 1985 bill on the Senate floor. The first has no relevance to the present inquiry. The second proposed to "strike out "at least equal to' and insert in lieu thereof "the same as.' "[19] Senator Helms offered scant explanation of this alteration:

> The amendment ... changes the provision relating to inspection of imported poultry products to provide that imported poultry must have been processed in facilities and under conditions that are the same *as those under which similar products are processed in the United States.* This change clarifies the provision to reflect the original intent of the provision as adopted by the committee in markup.[20]

No senator debated, discussed, or commented on the alteration before the Senate adopted it. A conference committee similarly failed to provide a reason for selection of the term "same" from the

---

[17]21 U.S.C. § 466(a).

[18]21 U.S.C. § 466(d) (emphasis added).

[19]131 Cong.Rec. 33358 (Nov. 22, 1985).

[20]*Id.* (emphasis added).

Senate bill, rather than the "at least equal to" standard in the House version.[21]  No one asked which

domestic standard.  As I explained, the statute accepts that there is a sameness of domestic standards.

There is:  It is the floor below which no domestic and—by the statute—no foreign produced poultry

may fall.  If Senator Helms in submitting his amendment or Congress in adopting it intended to embed

a protectionist measure in a bill dedicated to health issues, neither gave any sign or signal.[22]

B.

The majority's second argument, as I understand it, is that by using alternative processes to

ensure the quality of poultry, a foreign nation might gain some strategic advantage.  That the statute

does not say same processes, but same standards, does not slow the majority.  Congress might indeed

be unhappy if it unwittingly deprived domestic poultry producers of processes for ensuring the quality

of chickens that were less expensive than, and as effective as, those required by federal law.  If foreign

poultry producers adopted these processes of poultry production, and thereby increased their sales

in the United States, Congress might well respond.  It could do so by banning the less expensive

---

[21]H.R.Conf.Rep. No. 99-447, 99th Cong. 1st Sess. 583-84 (1985), *reprinted in* 3 U.S.C.C.A.N. at 2509-10 (1985).

[22]The stated concerns of the Senate Agricultural Committee were to protect American consumers from unsafe poultry and poultry products and the American poultry industry from competition with producers of unhealthy chickens and chicken parts.  The Committee described the function of the bill:

> *Poultry inspection*
>
> The bill strengthens present law regulating the importation of poultry or poultry products by prohibiting the importation of such poultry or poultry products where it is determined that such foreign products do not meet U.S. inspection, sanitary, quality, species verification, and residue standards and have not been processed in facilities and under conditions *at least equal to* those under which similar products are processed in the United States.  Any such imported poultry that does not meet such standards would not be allowed entry into the United States.
>
> The provision assures the American consumer of wholesome and safe food products while at the same time protecting the U.S. poultry industry from unfair competition from foreign producers who are permitted to sell products in this country that do not meet the standards set for U.S. producers.

S.Rep. No. 99-145, 99th Cong., 1st Sess. 339-40 (1985), *reprinted in* 3 U.S.C.C.A.N. at 2005-06 (1985) (emphasis added).

foreign poultry, the approach the majority opinion takes, or by allowing American poultry producers to adopt the foreign process, the approach I myself would think preferable. It is crucial to point out, however, that Congress has not as of yet done either. The majority has simply grafted onto the PPIA its own policy concern, reading it into the word "same," and never, I repeat, confronting the question—same as what?

III.

The majority relies on legislation passed subsequent to the PPIA to support an identicality standard. Congress responded to the Secretary's regulation in section 2507 of the Food, Agriculture, Conservation, and Trade Act of 1990 by stating that the regulation "does not reflect the intention of Congress" and "urg[ing] the Secretary ... to repeal the October 30, 1989 regulation and promulgate a new regulation reflecting the intention of Congress."[23] Congress did not purport to amend the PPIA

---

[23]Pub.L. No. 101-624, 104 Stat. 3359 (1990). Section 2507 reads:

(a) FINDINGS.—Congress finds that—

(1) in 1985 the [PPIA], an Act to maintain the integrity and wholesomeness of this Nation's food supply, was amended by the Food Security Act of 1985;

(2) the 1985 amendment provided that poultry products offered for importation into the United States shall be subject to the same inspection, sanitary, quality, species verification, and residue standards applied to products produced in the United States and that such products shall have been processed in facilities and under conditions that are the same as those under which similar products are processed in the United States; and

(3) on October 30, 1989, the Secretary of Agriculture, through the [FSIS], ... promulgated a regulation implementing the 1985 amendment to th[e] Act providing that a foreign inspection system seeking certification for export of poultry to the United States merely impose requirements at least equal to those applicable in the United States.

(b) SENSE OF CONGRESS.—It is the sense of the Congress that—

(1) the regulation promulgated by the Secretary of Agriculture, through the [FSIS], with respect to poultry products offered for importation into the United States does not reflect the intention of the Congress; and

(2) to urge the Secretary, through the [FSIS], to repeal the October 30, 1989 regulation and promulgate a new regulation reflecting the intention of the Congress.

104 Stat. at 4068-69.

nor did it make a finding as to its intentions at the time it passed the PPIA. The Secretary did not change the regulation in response to Congress' admonition.

The Supreme Court has made clear how to approach this legislation. "If th[e] language [of the 1990 Act] is to be controlling upon us, it must be either (1) an authoritative interpretation of what the [1985] statute meant, or (2) an authoritative expression of what the [1990] Congress intended. It cannot, of course, be the former, since it is the function of the courts and not the Legislature ... to say what an enacted statute means."[24] Nor can it be the latter because the 1990 Act made no claim to enact a new or to alter an old law. The language of the Act is clear: Congress urged the Secretary of Agriculture to repeal the October 30, 1989 regulation and to promulgate a new one. If, as I believe, the language of the PPIA permitted the Secretary's interpretation, Congress's later urging did not alter that fact.

One final congressional act bears on this case. In implementing the North American Free Trade Agreement, Congress enacted conforming amendments to numerous statutes, which included § 466(d) of the PPIA. Congress tailored the NAFTA legislation to alter only the relations of the United States with Mexico and Canada. The Act itself declares, "Nothing in this Act shall be construed ... to amend or modify any law of the United States ... unless specifically provided for in this Act."[25] Congress passed the NAFTA Implementation Act pursuant to an expedited process designed to have a restricted effect.[26] The empowering statute states that "the President shall recommend to Congress in the implementing bill and statement of administrative action ... that the benefits and obligations of [an international trade] agreement apply solely to the parties to the Agreement, if such application is consistent with the terms of the Agreement."[27] The statute then

---

[24]*Pierce v. Underwood,* 487 U.S. 552, 566, 108 S.Ct. 2541, 2550, 101 L.Ed.2d 490 (1988).

[25]Pub.L. No. 103-182 at § 102(a)(2), 107 Stat. at 2062.

[26]*See* Pub.L. No. 103-182 § 101(a), 107 Stat. 2061 (citing Section 1103 of the Omnibus Trade and Competitiveness Act of 1988 (19 U.S.C. § 2903) and section 151 of the Trade Act of 1974 (19 U.S.C. § 2191)).

[27]19 U.S.C. § 2903(a)(3).

denies Congress the opportunity to amend the legislation submitted by the President.[28]

The President and Congress focused on NAFTA when they revised the PPIA in 1993. Section 466(d) was wending its way through the federal courts. Implementation of this historic treaty could not stand still for an uncertain future day when we would offer a final interpretation. The immediate and practical need was for legislation guaranteeing that the PPIA did not violate the terms of NAFTA. The caution attending this effort is manifest in the statutory language. Section 466(d) states that Mexico and Canada may meet standards for poultry production that are either the "same" as *or* "equivalent" to those required in the United States.[29] Use of the disjunctive here gives rise to only one reasonable explanation. Regardless of whether one defines the word "same" as identical or equivalent, the provision contains a redundancy. Under either approach, foreign poultry products that meet standards that are the same as our own also meet standards equivalent to our own. Had Congress put in place only an equivalency standard, the effect would not have changed. This superfluity indicates that Congress had only one goal in mind when it amended the PPIA—to implement NAFTA. We are persuaded that the amendment is a practical response to uncertainty that offers no quick solution to this case.[30]

IV.

I respectfully disagree with my colleagues and dissent.

---

[28]19 U.S.C. § 2191(d). It is unclear, therefore, that the amendment to section 466(d) made to accommodate NAFTA *could* have altered the standards that nations other than Canada and Mexico must meet to import poultry products into the United States.

[29]21 U.S.C. § 466(d)(2)(A).

[30]*See Mackey v. Lanier Collection Agency & Service,* 486 U.S. 825, 839, 108 S.Ct. 2182, 2190, 100 L.Ed.2d 836 (1988) (noting that statute responded to court rulings and interpretation that created apparent redundancy was therefore justified).