# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 7, 2011

No. 09-40187

Lyle W. Cayce
Clerk

DUNN-MCCAMPBELL ROYALTY INTEREST INC, a Texas Corporation;
DUNN-PADRE CORPORATION, a Texas Corporation; MCCAMPBELL
MINERALS INC a Texas Corporation,

Plaintiffs - Appellees

v.

NATIONAL PARK SERVICE, an Agency of the United States Department of
Interior; JOSEPH ESCOTO, in His Official Capacity as Superintendent of the
Padre Island National Seashore,

Defendants - Appellants

Appeal from the United States District Court
for the Southern District of Texas

Before JOLLY and DENNIS, Circuit Judges, and BOYLE, District Judge.[*]

E. GRADY JOLLY, Circuit Judge:

Before 1963, there was no Padre Island National Park off the coast of the
State of Texas. It took a lot of maneuvering between the State of Texas and the
United States to create the national park out of these coastal island lands, much
belonging to the State of Texas, some belonging to private parties. The Texas
Consent Statute, the deeds of conveyance, the federal Enabling Act of 1962, and

---

[*] District Judge, Northern District of Texas, sitting by designation.

No. 09-40187

the Oil and Gas Management Plan of 2001, as well as the Energy Policy Act of 2005, are all involved in this appeal.

Now, almost fifty years later, this appeal presents a conflict between the National Park Service (the "Service")[1] and owners of certain mineral estates in the Padre Island National Seashore (the "Seashore"), with respect to those mineral owners' rights of ingress and egress over the Seashore's surface; such rights, if recognized, would allow the owners to exploit the subsurface minerals contained on the Island. The Service must manage the Seashore to preserve the environment for recreational use while respecting the legal rights of the mineral estate owners to extract oil and natural gas. In 2001, the Service attempted to strike this balance through its Oil and Gas Management Plan (the "Plan"). In this federal action, three related companies (collectively, "Dunn-McCampbell") seek declaratory relief under the Administrative Procedure Act ("APA"), 5 U.S.C. § 1 *et seq.*, arguing that the Plan exceeds the Service's regulatory power over the Seashore because it denies Dunn-McCampbell its rights of ingress and egress as provided by the special provisions of state and federal law that established the Seashore. The district court agreed and entered a declaratory judgment in Dunn-McCampbell's favor. The Service now appeals. Although we assume that the Service's normally broad regulatory authority over park lands is limited by the agreements between Texas and the Service that were made when the Seashore was established, we hold that these limitations do not provide the relief Dunn-McCampbell seeks today. We reverse, vacate, and remand.

I.

Padre Island is a narrow barrier island that stretches from Corpus Christi, Texas, nearly to the Mexican border. Long barren and inaccessible, the island began to draw interest from real estate developers after causeways were

---

[1] We also use this term to refer to the Department of the Interior and its Secretary.

completed at either end.  Developers and the federal government were not the only ones interested in the island.  Oil companies had discovered the island's oil and gas resources, and by the time the Seashore was created, there was extensive mineral exploitation on the Island.

Congress authorized the Seashore's creation in 1962.  *See* 16 U.S.C. §§ 459d-459d-7 (collectively, the "Enabling Act").  The Enabling Act provides that the Service is to administer the Seashore consistent with the law widely known as the National Park Service Organic Act ("Organic Act"), 16 U.S.C. §§ 1, 2–4, except as otherwise provided in the Enabling Act.  *Id.* § 459d-4.  Congress authorized the Service to acquire private property and interests in such property by purchase, condemnation, or otherwise, but provided that it could obtain state lands from Texas only with the state's "concurrence."  *Id.* § 459d-1(a).

Thereafter, on April 4, 1963, Texas's Legislature passed the "Consent Statute," authorizing the federal government to acquire public and private lands within the State "subject to the limitations contained in this Act." TEX. REV. CIV. STAT. art. 6077t § 3.[2]  Texas reserved its "entire mineral estate [with] the right of occupation and use of so much of the surface of the land or waters as may be required for all purposes reasonably incident to the mining, development, or removal of the minerals. . . ."  Texas also concurred in the Service's acquisition of private land, "provided that the acquisition of lands in such area shall not deprive the grantor or successor in title the right of ingress and egress for the purpose of exploring for, developing, processing, storing and transporting minerals from beneath said lands and waters with the right of housing employees for such purposes." *Id.* § 6. [3]

---

[2] The Consent Statute is reproduced in the Appendix.

[3] As we shall see, the phrase "grantors or successors in title" is crucial in applying the Consent Statute to Dunn-McCampbell's interests.

No. 09-40187

The Texas legislature directed the School Land Board to execute a deed incorporating the conditions set forth in the Consent Statute. *Id.* at § 3. The deed by which the State conveyed the State's land expressly provided that such conveyance of State lands was "subject to certain limitations, exceptions, and reservations set forth in the" Consent Statute, which, as we have just noted, addressed the acquisition of private lands as well. The Service, by virtue of this deed, acquired Texas's lands, and the Service separately acquired private lands. The Service acquired only surface, not mineral, estates.

In 1979, the Service implemented nationwide regulations concerning exploitation of mineral rights not owned by the Service within all national parks and seashores. 36 C.F.R. § 9.30, *et seq.* Dunn-McCampbell challenged those regulations in 1994, but the district court dismissed its suit as barred by the statute of limitations. *Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*, 964 F. Supp. 1125, 1132–33 (S.D. Tex. 1995), *aff'd* 112 F.3d 1283, 1287 (5th Cir. 1997). Those regulations are not at issue here, although the Service argued below that the current suit should be barred under res judicata principles, an argument that the district court rejected, and that is not appealed.

The regulations at issue stem from the Service's 2001 Oil and Gas Management Plan (the "Plan"). The Plan designates certain areas of the Seashore as Sensitive Resource Areas (SRAs) that contain "particularly rare and/or vulnerable resources." These areas cover 52.7 percent of the Seashore and carry with them various restrictions. The Plan notes that it "effectively close[s] surface use . . . [for] drilling operations" in 7.6 percent of the Seashore. The Plan at 9.[4] On the other hand, it projects that "all oil and gas would be

---

[4] In addition, one percent of the Seashore is closed to 3-D seismic exploration, with an additional 0.4 percent closed for part of the year. *Id.* Seven percent is off limits to new pipelines, 3.6 percent is closed to new roads, and the entire area covered by the SRAs (52.7 percent) is closed to new treatment and storage facilities. *Id.*

4

accessible," although there would likely be "increased costs for operators to design operations to avoid or reduce impacts to SRAs." *Id.* at 121–22. Further, the Plan notes that these increased costs might discourage resource exploitation. *Id.*[5]

Dunn-McCampbell brought suit in the Southern District of Texas under the APA, seeking a declaratory judgment that the Plan unlawfully violates the Enabling Act by closing certain areas of the Seashore to oil and gas activities and otherwise impairing Dunn-McCampbell's rights of ingress and egress. Dunn-McCampbell and the Service filed cross-motions for summary judgment. In its motion for summary judgment, Dunn-McCampbell contended that its rights of ingress and egress are protected by two provisions in the Enabling Act and that the Plan prevented it from exercising those rights. Specifically, it argued that the Enabling Act incorporated the Texas Consent Statute into federal law, and that the Consent Statute requires the Service to recognize Dunn-McCampbell's rights of ingress and egress. Dunn-McCampbell further argued that its rights of ingress and egress are preserved by a provision of the Enabling Act that protects the right of surface access for those who remove minerals from "outside the [Seashore's] boundaries." Finally, Dunn-McCampbell argued that the Energy Policy Act of 2005 demonstrates that Congress intended for the Enabling Act to preserve existing mineral interests. The Service argued that, under the Organic Act, it had the right to regulate easements, and, in doing so, to close certain lands to all drilling operations, and that the Enabling Act affords Dunn-McCampbell no special protection. It did not dispute Dunn-McCampbell's argument that the Plan is inconsistent with the rights of ingress and egress.

---

[5] Since the Service issued the Plan, several entities successfully have proposed Plans of Operations within the Seashore. *See Sierra Club v. Norton*, No. 03-40710, 2003 WL 22018886, at *1–2 (5th Cir. Aug. 27, 2003).

No. 09-40187

The district court held that the Consent Statute is assimilated into federal law, and thus is binding on the Service; that the Consent Statute protects Dunn-McCampbell's rights of ingress and egress;[6] and that the designation of the Sensitive Resource Areas, and accompanying regulations, deprive Dunn-McCampbell of that right.[7] The district court entered a declaratory judgment, declaring the Plan invalid insofar as it "close[s] certain areas of the [Seashore] or otherwise deprive[s] Dunn-McCampbell's rights of ingress and egress for the purpose of developing their oil and gas interests." The district court, however, also held the Enabling Act does not otherwise protect Dunn-McCampbell, regardless of any provisions in the Energy Policy Act of 2005. The Service filed a motion for an amended judgment under FED. R. CIV. P. 59(e), which the district court denied. The Service timely appealed to this court.[8]

II.

The overarching question presented by the Service's appeal is whether the trial court erred in granting summary judgment to Dunn-McCampbell on the grounds that the Plan, under the APA, 5 U.S.C. § 1, *et seq*, "transgressed the bounds fixed by Congress." *W. Coal Traffic League v. United States*, 694 F.2d 378, 383 (5th Cir. 1983). We review the district court's ruling on summary judgment *de novo*. *Croft v. Governor of Tex.*, 562 F.3d 735, 742 (5th Cir. 2009).

---

[6] Notably, the district court did not address whether Dunn-McCampbell is a "grantor or successor in title," under Sections 3 and 6 of the Consent Statute.

[7] The district court also held that, under the Consent Statute, the Texas Railroad Commission was authorized to regulate surface access, but that such regulations, and the Consent Statute generally, are binding on the Service only to the extent that they do not interfere with the Service's ability to administer the Seashore as a national park. The district court further held that the government had failed to show that the rights of ingress and egress interfered with administering the Seashore as a national park.

[8] Dunn-McCampbell cross-appealed to preserve its ability to argue for upholding the district court's judgment on grounds rejected by the district court. As the Service has conceded that Dunn-McCampbell can make these arguments without appealing, Dunn-McCampbell moved to dismiss its appeal before oral argument. The motion was granted.

No. 09-40187

### III.

Dunn-McCampbell presents three arguments to support its position that the Plan violates the APA. First, it argues that the Plan is inconsistent with the Congressional grant of power to the Service to promulgate regulations, insofar as the Plan violates Dunn-McCampbell's rights of ingress and egress that are protected in the Consent Statute, and hence in the Enabling Act. Second, Dunn-McCampbell argues that because the Service does not own the mineral estate which lies beneath the park, and because the mineral estate is thus *outside* the Seashore's boundaries, under the terms of the Enabling Act, it has special rights of ingress and egress. Third, and finally, Dunn-McCampbell argues that Congress, speaking through a Sense of Congress provision contained in the Energy Policy Act of 2005, has expressly provided that the Service, under the terms of the Enabling Act, must respect Dunn-McCampbell's rights of ingress and egress.[9]

### IV.

The grant of summary judgment in favor of Dunn-McCampbell should be affirmed only "if the record demonstrates that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Croft*, 562 F.3d at 742 (quotation marks and citation omitted). The ultimate question that we must answer is whether the trial court erred in holding that the Service's regulations are contrary to law, and thus in violation of the APA, insofar as the regulations apply to Dunn-McCampbell's rights of ingress and egress.

---

[9] We do not address whether the Plan is itself a proper exercise of the Service's authority under the Organic Act, because the question on this appeal is not so broad. Instead, we only address whether, after assuming the Federal Enabling Act limits the power traditionally afforded the Service under the Organic Act, such limitations entitle Dunn-McCampbell to the declaratory relief it seeks.

No. 09-40187

It is of course basic that the Constitution affords Congress the power to make laws that apply on federal lands, and it has been accepted that such "power over the public land . . . is without limitations." *Kleppe v. New Mexico*, 426 U.S. 529, 540 (1976); *United States v. San Francisco*, 310 U.S. 16, 29 (1940). Unlike Congress, however, agency power is not so broad; the Service can act only within its statutory authority. We therefore must apply the Enabling Act, which created the Seashore, authorized the Service to acquire land for the Seashore, and set out the Service's regulatory authority. It provides, in pertinent part:

> Except as otherwise provided in sections 459d to 459d-7 of this title, the property acquired by the Secretary under such sections shall be administered by the Secretary, subject to the provisions of sections 1 and 2 to 4 of this title, as amended and supplemented, and in accordance with other laws of general application relating to the areas administered and supervised by the Secretary through the National Park Service; except that authority otherwise available to the Secretary for the conservation and management of natural resources may be utilized to the extent he finds such authority will further the purposes of sections 459d to 459d-7 of this title.

16 U.S.C. § 459d-4. The reference to "sections 1 and 2 to 4 of this title" is to the Organic Act. The Enabling Act thus provides that the Organic Act, subject to certain exceptions, shall apply to the Seashore. Two of these exceptions are crucial to our analysis, and we discuss each below.

A.

The first relevant exception to the Organic Act contained in the Enabling Act provides that "[a]ny property, or interest therein, owned by the State of Texas or political subdivision thereof may be acquired only with the concurrence of such owner." 16 U.S.C. § 459d-1(a).[10] The Service contends that the Consent

---

[10] The specifics of Texas's concurrence are found in the Consent Statute and in the deed conveying State lands to the Service. In this opinion, we examine the Consent Statute, but not the deed, as the parties' arguments center on the former, and the deed reflects the terms of the Consent Statute.

No. 09-40187

Statute does not limit its authority to regulate the Seashore.[11]  For the purposes

of this case, however, we will assume that the terms of the Consent Statute bind

the Service.[12]  We further assume that, although the Enabling Act requires the

concurrence only of the State of Texas, the Consent Statute's special protections

extend to certain private mineral interests referenced in the Statute.

We thus turn to determine whether, after applying these assumptions,

Dunn-McCampbell's rights of ingress and egress are, under the Consent Statute,

excepted from the Service's regulations.  In making this determination, as set

out more fully below, we will first examine the plain language of the Consent

Statute; only then, if it is necessary, will we consider the legislative history.

Section 3 of the Consent Statute provides, in relevant part, that

> [i]n all conveyances of said park property under Sections 3 and 6
> hereof to the United States of America, the Secretary of the Interior
> shall permit a reservation by the grantor of all oil, gas, and other
> minerals in such land or waters with the right of occupation and use
> of so much of the surface of the land or waters as may be required
> for the purposes of reasonable development of oil, gas, and other
> minerals. . . .

Tex. REV. CIV. STAT. art. 6077t § 3. Section 6 similarly provides that the Service

"shall not deprive the grantor or successor in title of the right of ingress and

---

[11] As we have said, pursuant to congressional authority, the Service was authorized to acquire the lands constituting the Seashore only with Texas's concurrence, *see* 16 U.S.C. § 459d-1(a), and Texas's concurrence was contained in the Consent Statute and in the deed conveying Texas's land.  The Service concedes that the Plan is incompatible with the rights of ingress and egress protected in the Texas Consent Statute.

[12] Given this assumption, we do not address the merits of Dunn-McCampbell's argument that the Service is bound by the Consent Statute.  To summarize, however, Dunn-McCampbell argues that the Seashore is a federal enclave that was created via cession from the state. Dunn-McCampbell argues that under established precedent, when the federal government acquires state land by cession, that cession necessarily includes the state's consent, and the federal government must respect the terms of the state's consent, and here that means the Consent Statute.  Finally, Dunn-McCampbell contends that although Section 459d-1(a) refers only to Texas's concurrence, the Consent Statute requires, as a term of Texas's concurrence in the transfer of the State's property, that the Service honor the rights of ingress and egress held by the affected private mineral owners.

egress for the purpose of exploring for, developing, processing, storing and transporting minerals from beneath said lands and waters with the right of housing employees for such purposes." TEX. REV. CIV. STAT. art. 6077t § 6.

Dunn-McCampbell suggests that Sections 3 and 6 of the Consent Statute are ambiguous, and the intent of the statute is effectively to recognize Dunn-McCampbell's rights of ingress and egress.[13]   The Service argues that the Consent Statute, in express terms, protects only those private mineral owners who conveyed surface land to the Service, or their successors in title; consequently, Dunn-McCampbell is not protected, because Dunn-McCampbell concedes that neither it nor any of its predecessors ever transferred surface land to the Service; that is to say, the mineral estate owned by Dunn-McCampbell had been severed from the surface estate before the surface estate was conveyed to the Service.  The key question, then, is whether, the term, "grantor or successor in title,"[14] can be construed--or ignored--so as to allow Dunn-McCampbell's rights of ingress and egress to come within coverage of the Consent Statute.

To reiterate, we begin our analysis with the plain text of the Consent Statute: "when the plain language of a statute is unambiguous and does not

_____

[13] An argument raised by Dunn-McCampbell centers on its general property right under Texas law to exploit its mineral estate.  Dunn-McCampbell may well be correct that the Service transgressed Texas property rights.  The question before us, however, is whether the Service has transgressed the boundaries of its authority as set by Congress.  If Congress has authorized the Service to appropriate Dunn-McCampbell's property interests, Dunn-McCampbell may have a claim in the nature of a taking, but this is not a claim we can decide today.

[14] We recognize that Dunn-McCampbell argues that Section 3 provides protection to private landowners, and not just to Texas, as the Service argues.  Again, we will assume, without deciding, that Dunn-McCampbell's position is correct, i.e., that the terms of Section 3 protect private landowners.  Left unanswered by this assumption, however, is whether Dunn-McCampbell falls within the category of a grantor under Section 3 or Section 6.  The Texas Legislature's repeated use of the term "grantor" suggests that the term was used purposefully, and thus should be given its ordinary and plain meaning.

lead to an absurd result, our inquiry begins and ends with the plain meaning of that language." *United States v. Clayton*, 613 F.3d 592, 596 (5th Cir. 2010) (quotation marks and citation omitted).  The plain language of the Consent Statute affords Dunn-McCampbell no protection.  Dunn-McCampbell had no ownership interest in the surface estate above its land, did not convey or "grant" any land to the Service, and is not a successor of any party that did convey land to the Service; in short, Dunn-McCampbell, unambiguously, is simply not a grantor or a successor in title.  Consequently, we must interpret the Consent Statute to exclude Dunn-McCampbell's interest, unless to do so is absurd or causes an absurd result.

Dunn-McCampbell argues that it is absurd to assume that Texas's Consent Statute only extends its protections to the unsevered private mineral estates.   Dunn-McCampbell contends that, under this interpretation, the Consent Statute fails to address the majority of the mineral estates within the Seashore because, when the Seashore was created, "[o]wnership of the mineral interests in Padre Island ha[d] been separated largely, if not completely, from the ownership of the surface interests."  S. REP. NO. 1226, at 12-13 (1962). Dunn-McCampbell argues further that it is absurd to conclude that the Texas Legislature, which was concerned with protecting the right to exploit all mineral interests, would intend that the rights of ingress and egress be protected only to the extent such interests are held by "grantors or successors in title."  Dunn-McCampbell also contends that the federal legislative history of the Enabling Act shows that Congress, in passing the Enabling Act, sought to protect the private rights of ingress and egress.[15]  On the other hand, the Service contends

_____

[15] Dunn-McCampbell cites legislative history in the form of House and Senate reports, and an affidavit from a former Congressman.  We will assume that the legislative history cited by Dunn-McCampbell would substantially advance its argument if we were required to rely on legislative history to interpret the Consent Statute.  Legislative history, however, is a useful interpretive tool only in cases of ambiguity or absurdity.

11

that no absurd result follows from giving the terms in the Consent Statute a plain meaning. While apparently conceding that such an interpretation could lead to a "checkerboard of ownership rights depending upon how and when the oil and gas estate was severed from the surface estate[,]" the Service contends that "[c]heckerboard ownership...is not a novelty in federal land management," and that nothing in the record demonstrates congressional intent to avoid this type of arrangement.

It is certainly true that we should "avoid any interpretation that would lead to absurd or unreasonable outcome[,]" *see Carpenters Dist. Council of New Orleans & Vicinity v. Dillard Dept. Stores, Inc.*, 15 F.3d 1275, 1285 (5th Cir. 1994), but we cannot agree that applying the plain language of the Consent Statute leads to an absurd result. Legislative history might well support an argument that some members of the Texas Legislature and some members of Congress intended specially to protect the rights of ingress and egress held by all mineral estate owners, including those of the character of Dunn-McCampbell. We, however, do not turn to legislative history in this case, as the statute is not ambiguous, and applying the literal language does not create an absurd result.

It cannot be labeled absurd that the State of Texas referred only to grantors and successors in title, when severed mineral interest holders were not parties or potential parties to the transactions establishing the park; such interests were not involved in obtaining parklands; and negotiations with the federal government here did not immediately threaten those private interests at the time. Indeed, protecting grantors' rights to their mineral estates may have provided an assurance and an inducement for surface owners to convey their surface estates to the Service, without going through a condemnation process. Moreover, the fact that Texas referred to "grantors" throughout the Consent Statute indicates the word choice was not an accident, and thus that interpreting the word literally does not lead to an unintended result. If Texas

had intended to address such interests as Dunn-McCampbell's, it easily could have done so by using broader language in crafting its consent, e.g., "All existing easements on the land, irrespective of whether the owners of such easements convey any land to the federal government, must be fully respected." As we have seen, such language was not used.  Nor can it persuasively be argued that the omission of such interests was a mere oversight; as Dunn-McCampbell itself points out that when the Seashore was created, it was well understood that the majority of the subsurface mineral estates had been severed from the surface estates. *See* S. REP. NO. 1226, at 12-13 (1962). Notwithstanding this well known fact, the Consent Statute specifically protected only grantors and their successors in title. Finally, the checkerboard ownership of public and private ownership within the park exists in other parks, further suggesting that the plain meaning of the statute does not lead to a ridiculous result.  *See Sierra Club v. Babbitt*, 65 F.3d 1502, 1505 (9th Cir. 1995); *Mountain States Legal Found. v. Hodel*, 799 F.2d 1423, 1424 (10th Cir. 1986).  Although it is true we are surmising reasons for supporting the wording of the Consent Statute's language, and each of these reasons may not have been specifically in the minds of those who engaged in these transactions in 1962 and 1963, we set them out to show only that giving the terms "grantor or successor in title" a plain meaning is not absurd or unreasonable.

Thus, in sum, we have assumed that Section 459d-1(a) of the Enabling Act, implicitly reflecting the terms of the Consent Statute, provides an exception to the Service's Organic Act authority to regulate mineral interests in national parks.  We have concluded, however, that because Dunn-McCampbell is not a grantor or successor in title as provided in Sections 3 and 6, the plain language of the Consent Statute affords Dunn-McCampbell no protection; and we further have concluded that applying the plain language of the Consent Statute is not an absurdity.  We have thus rejected Dunn-McCampbell's argument that we

13

should resort to legislative or congressional history for interpretative guidance. Consequently, we hold that Dunn-McCampbell is not protected by the terms of the Consent Statute.

B.

Having determined that Dunn-McCampbell is not protected under the Texas Consent Statute, we must decide whether Dunn-McCampbell is, as it argues, protected by a second relevant exception to the Organic Act contained in the Enabling Act, which provides that:

> Any acquisition hereunder shall exclude and shall not diminish any right of occupation or use of the surface under grants, leases, or easements existing on April 11, 1961, which are reasonably necessary for the exploration, development, production, storing, processing, or transporting of oil and gas minerals *that are removed from outside the boundaries* of the national seashore and the Secretary may grant additional rights of occupation or use of the surface for the purposes aforesaid upon the terms and under such regulations as may be prescribed by him.

16 U.S.C. § 459d-3(b) (emphasis added).

The Service urges that this exception does not apply because Dunn-McCampbell's mineral estate is *within* the Seashore's boundaries. Dunn-McCampbell counters that because the Service owns only the surface estate, its subsurface mineral estate is outside the property that the Service owns and thus outside the park boundaries of the Seashore, and that this means that the minerals removed from these estates "are removed from outside the park boundaries." Dunn-McCampbell thus argues that its easements under Texas law are protected by the provisions of Section 459d-3(b).

At this point, it is worthwhile for us to refer to the facts underlying this argument. Under the terms of the Texas Consent Statute, the Service was permitted to acquire only the surface estate; it was specifically not permitted to acquire, and did not acquire, the subsurface mineral estates. Therefore, the

question raised, for purposes of Dunn-McCampbell's argument, is whether the land beneath the surface estate is within the Seashore's boundaries. The Service, acknowledging that it does not own the mineral estates, contends that precedent from other circuits makes clear that privately owned property can exist within the boundaries of a national park; thus, whether the mineral estates are privately owned does not determine the boundaries of this national park. Dunn-McCampbell disagrees, arguing that because the Service did not acquire the mineral estates, these estates are necessarily outside the park boundaries. Dunn-McCampbell further argues that because the authority relied on by the Service concerns only horizontal, and not vertical boundaries, this authority is irrelevant to the question raised by the mineral estates located beneath the surface estate. Dunn-McCampbell's argument is, in effect, that when the Service acquired the surface estate, the conveyance included no subsurface soil or space, and that all subsurface land, including the mineral estates underlying the Seashore, is therefore "outside the boundaries of the national seashore," within the meaning of the Enabling Act. Dunn-McCampbell offers no authority that would directly support this novel proposition.[16]

---

[16] In addition to the arguments we address in the body of this opinion, Dunn-McCampbell also argues that a Sense of Congress provision contained in the Energy Policy Act of 2005 (attached to this opinion as Appendix II) suggests that the "outside the boundaries" language was intended to preserve Dunn-McCampbell's rights of ingress and egress over the Seashore's surface. *See* Pub. L. No. 109-58 § 373, 119 Stat. 594 (August 8, 2005). The argument is that although this 2005 expression of the Sense of Congress does not define "outside the boundaries," it nonetheless demonstrates the enacting Congress's intent, as reflected in the Enabling Act, to provide broad protections to all owners of mineral estates, irrespective of whether such estates are located under public land. Dunn-McCampbell thus contends that if we are to honor this broad congressional intent, we must interpret Section 459d-3(b) of the Enabling Act to protect Dunn-McCampbell's rights. The question arises, however, whether the Sense of Congress is an appropriate interpretative tool to aid our decision today. Unlike the consistent regulatory interpretations that shed light on the Supreme Court's decision in *Red Lion v. F.C.C.*, 395 U.S. 367, 380-81 (1960), in the 43 years that elapsed between the passage of the Enabling Act and the Energy Policy Act, the Service promulgated no regulation that would justify our ruling in Dunn-McCampbell's favor. *Red Lion* hardly did more than note that the 1959 Congress had reaffirmed the agency's

No. 09-40187

Although it is true that Dunn-McCampbell and others own mineral estates beneath the Seashore's surface, the conveyance of mineral rights ownership does not convey the entirety of the subsurface. As the Texas Supreme Court has stated, "[t]he minerals owner is entitled, not to the molecules actually residing below the surface, but to a fair chance to recover the oil and gas. . . ." *Coastal Oil & Gas Corp. v. Garza Energy Trust*, 268 S.W.3d 1, 15 (Tex. 2008). In other words, if there are no minerals beneath the surface of the Seashore, Dunn-McCampbell owns the legal fiction of an estate that is nothing.

Here, there was a conveyance of land to the Service. "[L]and includes the surface of the earth and everything over and under it, including minerals in place..." *Averyt v. Grande Inc.*, 717 S.W.2d 891, 894 (Tex. 1986). In this case, the minerals were not "in place" since they had been severed or were reserved. Although "[t]here is a difference . . . between the estate granted and the land described [in that] [l]and is the physical earth in its natural state, while an estate in land is a legal unit of ownership in the physical land[,]" *see id.*, it

_____

interpretation that had been adopted "shortly" after legislation was enacted in 1927, and that Congress had approved *sub silentio* for many years. *Id.* at 378-81. We further note that in 2005, only three members of the 1962 Congress remained on Capitol Hill. Finally, although a sense of Congress provision can, in some instances, provide valuable assistance in interpreting earlier legislation, *see Miss. Poultry Ass'n v. Madigan*, 31 F.3d 293, 298, 303 (5th Cir. 1994), such provisions are of limited legal effect.

In any event, the most important question in evaluating the worth of subsequent legislation as an interpretive tool is whether the subsequent legislation properly captures the intent of the enacting Congress; for this purpose, subsequent legislation is often of very little value. *See* William N. Eskridge, Jr., *Overriding Supreme Court Statutory Interpretation Decisions*, 101 YALE L.J. 331, 402 (1991). In application, subsequent legislative history is more often relied upon by courts to gauge Congress's willingness to engage in a statutory override of an agency's or a court's interpretation of a statute. *Id.* at 402-03. Arguably, however, if a subsequent Congress wants to substitute its own intent for the perceived intent of the enacting Congress, it should amend the relevant statute. Viewed in this light, the 2005 Sense of Congress is at best indirectly responsive to the question we address--the meaning of "outside the boundaries of the national seashore" in the Enabling Act--and cannot be applied to override the unambiguous intent of the 1962 Congress as expressed in the statutory language of the Enabling Act.

unbearably strains credulity to suggest that a surface estate, conveyed in a deed describing the land in horizontal terms, only touches a millimeter of the surface, and excludes all other land below the surface.  If, as here, the surface estate alone is conveyed, and a mineral reservation is made, the conveyance "vests in the grantee such rights to the use thereof as are usually exercised by owners in fee subject *only* to the right of the grantor to remove the minerals reserved." *Fleming Found. v. Texaco, Inc.*, 337 S.W.2d 846, 851 (Tex. Civ. App. 1960) (emphasis added).  As we have noted, the mineral estate owner does not own the "molecules actually residing below the surface."  *Coastal Oil & Gas Corp.*, 268 S.W.3d at 15.  It thus stands to reason that the Service, not Dunn-McCampbell, owns all non-mineral "molecules" of the land, i.e., the mass that undergirds the surface of the National Seashore.

With respect to Dunn-McCampbell's argument that its privately owned property cannot be within the boundaries of a public park, it undoubtedly is true that Dunn-McCampbell privately owns the mineral estate beneath the publicly owned surface of the Park.  The ownership of property, however, does not establish a park's boundaries, as has been made clear by at least three circuits, which have held that land that is not owned by the Service can still exist within the boundaries of a national park.  *See United States v. Stephenson*, 29 F.3d 162, 164 (4th Cir. 1994); *Free Enter. Canoe Renters Ass'n of Mo. v. United States*, 711 F.2d 852, 856 (8th Cir. 1983); *Macomber v. Bose*, 401 F.2d 545, 547 (9th Cir. 1968).  Although Dunn-McCampbell is correct that these cases deal with horizontal boundaries, the reasoning of these cases is applicable to defining park boundaries in whatever abstraction of space the question may be presented. *Stephenson*, in particular, is instructive:  the Fourth Circuit stated that "[t]he primary inquiry in determining the applicability of Park laws to a given area must therefore be whether that area is within the statutory boundaries of the

No. 09-40187

Park, not whether [the Service] holds title to the land in question." 29 F.3d at 164.

To summarize, Dunn-McCampbell does not own the land below the Seashore's surface, and, even if it did, the subsurface land would still be within the park's boundaries. Texas law establishes that the holder of a mineral estate has the right to exploit minerals, but does not own the subsurface mass. We have also relied on precedent from other circuits to hold that land that is not owned by the National Park Service can nonetheless be within the boundaries of a National Park. We thus hold Dunn-McCampbell's mineral estate is within the Seashore's boundaries, and that Section 459d-3(b) therefore does not provide Dunn-McCampbell with any special right of ingress and egress over the Seashore's surface.

V.

We will now wrap up. We have assumed that the Service, pursuant to 16 U.S.C. § 459d-1(a), is bound by the terms of Texas's concurrence when it deeded its land to the Service. The terms of the concurrence, which are set out in the Consent Statute, provide, in relevant part, that owners of private land who convey land to the Service may preserve their mineral rights and the rights of ingress and egress to exploit their mineral estates, for themselves and for their successors in title. We have held, however, that these provisions do not apply to Dunn-McCampbell, as it is neither a grantor nor a successor in title as referred to in the Consent Statute.

We have also assumed that 16 U.S.C. § 459d-3(b) requires the Service to recognize the rights of ingress and egress possessed at the time of Texas's conveyance by those who remove minerals from outside the Seashore's boundaries. We have held, however, that the mineral estate owned by Dunn-McCampbell, although not owned by the Service, and beneath the surface of the Seashore, is within the Seashore's boundaries.

18

No. 09-40187

We thus conclude that because Dunn-McCampbell does not fall under any of the special protections provided in the Enabling Act, the trial court erred in granting Dunn-McCampbell summary judgment, and accordingly we thus reverse and vacate the district court's declaratory judgment and remand for entry of judgment in favor of the Service.

REVERSED in part, VACATED and REMANDED.

\*\*\*

APPENDIX I (The Consent Statute)

An Act relating to the creation of Padre Island National Seashore; containing a reverter clause; and declaring an emergency.

*Be it enacted by the Legislature of the State of Texas:*

Section 1. The surface estate of that part of the following described lands situated in Kleberg, Kenedy, and Willacy Counties, Texas, to which the State of Texas has title or that have been acquired or that may become vested under any previous Act or Acts, shall be and is hereby established, dedicated and set apart as a public park for the benefit and enjoyment of the people. The surface estate in the following described lands shall be designated as the "Padre Island National Seashore," which area is described as follows:

BEGINNING at a point one statute mile North of the North end of North Bird Island on the easterly line of the Intracoastal Waterway;

THENCE due East to a point on Padre Island one statute mile West of the mean high water line of the Gulf of Mexico;

THENCE southwesterly paralleling the said mean high water line of the Gulf of Mexico a distance of three and five-tenths statute miles;

THENCE due east to the two-fathom line on the east side of Padre Island as depicted on United States Coast and Geodetic Survey chart numbered 1286;

THENCE along the said two-fathom line on the east side of Padre Island as depicted on United States Coast and Geodetic Survey charts numbered 1286, 1287, and 1288 to the Willacy-Cameron County line extended;

THENCE westerly along said county line to a point 1,500 feet west of the mean high water line of the Gulf of Mexico as that line was determined by the survey of J. S. Boyles and is depicted on sections 9 and 10 of the map (on file in the General Land Office) entitled "Survey of Padre Island made for the office of the Attorney General of the State of Texas", dated August 7 to 11, 1941, and August 11, 13, and 14, 1941, respectively;

No. 09-40187

THENCE northerly along a line parallel to and 1,500 feet west of said survey line of J. S. Boyles, to a point on the centerline of the Port Mansfield Channel;

THENCE westerly along said centerline to a point three statute miles west of the said two-fathom line;

THENCE northerly parallel with said two-fathom line to a point on 27 degrees 20 minutes north latitude;

THENCE west along said latitude to the easterly line of the Intracoastal Waterway;

THENCE northerly following the easterly line of the Intracoastal Waterway as indicated by channel markers in the Laguna Madre to the point of BEGINNING.

Sec. 1a.  Nothing in this bill is intended to extend any recognition to any line as being the boundary line between the state-owned portion of the seashore and the privately-owned land.

Sec. 2.  The Legislature of the state of Texas hereby withdraws from sale the surface estates of all state-owned lands in said area regardless of the purpose or purposes for which they are held and regardless of the instrumentality of the state for which they are held.

Sec. 3.  The United States of America through the Secretary of Interior is granted permission, subject to the limitations contained in this Act, to acquire the area that has been defined as Padre Island National Seashore and the School Land Board of the State of Texas is hereby authorized and directed forthwith to execute a deed of conveyance to the United States of America conveying all of the right, title and interest of the State of Texas in the surface estate of all lands described in Section 1 hereof, subject to the exceptions and reservations hereinafter set forth under the terms of this Act, for the Padre Island National Seashore for the use of the public as a recreation area, in consideration of the United States of America agreeing to establish and maintain the land described in Section 1 hereof as a National Seashore area, as provided for under an Act of Congress, being Public Law 87–712, enacted by the 87th Congress of the United States, and to cede to the United States of America jurisdiction over said lands, and including lands acquired under Section 6 hereof, in conformity with the provisions of Article 5247, Revised Civil Statutes of Texas 1925.  Said deed shall be executed by a majority of the then members of the School Land Board and shall also reserve to the State of Texas the right of concurrent jurisdiction with the United States of America, both civil and criminal, over every portion of the lands described in Section 1 hereof, so that all process, civil and criminal, issuing under the authority of this state or any of the courts or judicial officers thereof, may be executed by the proper officers of the state, upon any person amenable

to the same within the limits of the land constituting the "Padre Island National Seashore," as set out in Section 1 hereof, in like manner and like effect as if no such cession had taken place; and, reserving further to the state the right to levy and collect taxes on sales, use or gross receipts from sales of products or commodities upon which a tax is levied in this state, and to tax persons and corporations, their franchises, properties and incomes, on land or lands conveyed under the terms of this Act; and reserving also, to persons residing in or on any of the land or lands conveyed, the right to vote at all elections within the counties in which said land or lands are located, upon like terms and conditions and to the same extent as they would be entitled to vote in such counties had not such lands been conveyed as aforesaid to the United States of America.

Said state land shall not be conveyed unless the entire mineral interest is reserved in the state, and unless the right of occupation and use of so much of the surface of the land or waters as may be required for all purposes reasonably incident to the mining, development, or removal of the minerals, is adequately protected.

In all conveyances of said park property under Sections 3 and 6 hereof to the United States of America, the Secretary of the Interior shall permit a reservation by the grantor of all oil, gas, and other minerals in such land or waters with the right of occupation and use of so much of the surface of the land or waters as may be required for the purposes of reasonable development of oil, gas and other minerals, under such rules and regulations as may be established by the Railroad Commission of the State of Texas. The Railroad Commission shall submit a copy of any proposed rules and regulations affecting the National Seashore area to the United States Department of Interior, Washington, D. C., by certified mail. The Department of Interior shall have thirty (30) days from receipt thereof to submit, by certified mail, to the Railroad Commission of Texas, any objection or exceptions to such proposed regulations. Thereupon, such rules and regulations, with amendments, if any, promulgated by the Railroad Commission of Texas, shall become effective. It is the intention of the Legislature of the State of Texas that the use of said land for this purpose be carried out in such a manner as to not unreasonably interfere with the use of said park land for park purposes.

Sec. 4. The Commissioner of the General Land Office shall prepare a list of the lands now owned in said area by the State of Texas or its instrumentalities for any purpose and deliver a certified copy of such list to the School Land Board for its records.

Sec. 5. Any deed executed pursuant to the authority hereinabove set out shall be null and void and of no force and effect and any and all rights, titles, and interests granted and conveyed thereby shall revert to the State of Texas upon

the initiation by any agent, agency, officer, department, or employee of the Federal Government of the United States, whether appointed or elected, of a suit at law or in equity in any Federal Court of the United States to enlarge or expand the titles, rights, or interests granted by said deed or deeds.

Sec. 6.   The United States of America, through the Secretary of the Interior, is hereby authorized to purchase, condemn, receive, hold and acquire title to the surface estate of any land not owned by the state in the area above-described as the Padre Island National Seashore for use as a recreational park; provided that the acquisition of lands in such area shall not deprive the grantor or successor in title of the right of ingress and egress for the purpose of exploring for, developing, processing, storing and transporting minerals from beneath said lands and waters with the right of housing employees for such purposes.  The same reservations and regulations enumerated in Section 3 hereof, relating to civic and criminal jurisdiction, process, levy and collection of taxes, mineral development, and voting rights, shall apply to all lands acquired by the United States of America under this Section.

Sec. 7.  The surface estate in and to the lands, spoil banks, easements or rights-of-way owned, leased or otherwise controlled by the Willacy County Navigation District may be acquired for inclusion in Padre Island National Seashore with the consent of the District.  All such surface estates in and to lands, spoil banks, easements and rights-of-way owned, leased or otherwise controlled by the Willacy County Navigation District located in the Padre Island National Seashore shall be used solely for public purposes.

Sec. 8.  The Secretary of the Interior is requested to provide for roadways from the north and south boundaries of such public recreation area to the access highways from the Mainland to Padre Island.  For the purpose of this Section, the south boundary shall be considered the Port Mansfield cut.

Sec. 9.  If the United States of America (1) fails to acquire the surface estate in two-thirds of the total privately-owned land located within the Padre Island National Seashore Area as defined in Section 1 of this Act within ten (10) years from the date of acquisition by the United States of America of the state-owned portion of the land described in Section 1 hereof, or (2) after such ten-year period ceases to use the surface estate of the privately-owned land so acquired under the authority of this Act for a national seashore area as contemplated herein, then in either event, all state-owned lands conveyed to the United States of America under the authority of Section 3 hereof shall ipso facto and without further action by any of the parties hereto revert to the State of Texas and to the fund to which they belonged prior to the passage of this Act, unless such reversion shall be waived by the Legislature of the State of Texas during the biennium following the happening of either of the conditions of reversion.

No. 09-40187

Sec. 10.  If any provision of this Act or the application thereof to any person or circumstance is held invalid, such invalidity shall not affect other provisions or applications of the Act which can be given effect without the invalid provision or application, and to this end the provisions of this Act are declared to be severable.

Sec. 11.  All laws or parts of laws in conflict with the provisions of this Act are repealed to the extent of such conflict only.

Sec. 12. The fact that the United States Congress has enacted legislation creating Padre Island National Seashore and the fact that such an area will be of great benefit not only to the people of Texas but also to the nation at large, and the fact that state-owned submerged lands in this area are presently for sale to certain districts, create an emergency and an imperative public necessity that the Constitutional Rule requiring bills to be read on three several days in each House be suspended, and this Rule is hereby suspended, and that this Act shall take effect and be in force from and after its passage, and it is so enacted.

## APPENDIX II

SEC. 373. SENSE OF CONGRESS REGARDING DEVELOPMENT OF MINERALS UNDER PADRE ISLAND NATIONAL SEASHORE.

(a) FINDINGS.--Congress finds the following:

(1) Pursuant to Public Law 87-712 (16 U.S.C. 459d et seq.; popularly known as the "Federal Enabling Act") and various deeds and actions under that Act, the United States is the owner of only the surface estate of certain lands constituting the Padre Island National Seashore.

(2) Ownership of the oil, gas, and other minerals in the subsurface estate of the lands constituting the Padre Island National Seashore was never acquired by the United States, and ownership of those interests is held by the State of Texas and private parties.

(3) Public Law 87-712 (16 U.S.C. 459d et seq.)--

(A) expressly contemplated that the United States would recognize the ownership and future development of the oil, gas, and other minerals in the subsurface estate of the lands constituting the Padre Island National Seashore by the owners and their mineral lessees; and

(B) recognized that approval of the State of Texas was required to create Padre Island National Seashore.

(4) Approval was given for the creation of Padre Island National Seashore by the State of Texas through Tex. Rev. Civ. Stat. Ann. Art. 6077(t) (Vernon 1970),

23

which expressly recognized that development of the oil, gas, and other minerals in the subsurface of the lands constituting Padre Island National Seashore would be conducted with full rights of ingress and egress under the laws of the State of Texas.

(b) SENSE OF CONGRESS.--It is the sense of Congress that with regard to Federal law, any regulation of the development of oil, gas, or other minerals in the subsurface of the lands constituting Padre Island National Seashore should be made as if those lands retained the status that the lands had on September 27, 1962.

No. 09-40187

DENNIS, Circuit Judge, concurring.

I join in the majority opinion, but in doing so, intimate no decision as to the ultimate contours of the Enabling Statute or the bounds of the Service's authority. That decision is not necessary or relevant here because, even assuming arguendo that the plaintiffs' proffered interpretation of the Enabling Act is correct, they cannot prevail in any event. As the majority opinion so clearly demonstrates, whatever rights the plaintiffs have as to their mineral estates were excluded from reservation or protection by the Texas Consent Statute, under which they erroneously claim their rights are protected.